**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV13-02171 JAK (PLAx) | Date | June 11, 2014 |
| Title | Betelhem Shiferaw v. Sunrise Senior Living Management, Inc., et al. | | |

| | |
|---|---|
| Present: The Honorable | JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE |

| | |
|---|---|
| Andrea Keifer | Not Reported |
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:** **BETELHEM SHIFERAW AND RENEE TAMEIFUNA, ET AL'S MOTION FOR CLASS CERTIFICATION (DKT. 78, 81);**

**DEFENDANTS' MOTION TO EXCLUDE THE DECLARATION OF MATTHEW MATERN (DKT. 93);**

**DEFENDANTS' MOTION TO EXCLUDE THE DECLARATION AND REPORT OF DR. JAMES LACKRITZ (DKT. 94)**

## I. Introduction

Betelhem Shiferaw ("Shiferaw") and Renee Tameifuna ("Tameifuna") (collectively, "Plaintiffs" ) bring these consolidated putative class actions against Sunrise Senior Living Inc., Sunrise Senior Living Management, Inc., and Sunrise Senior Living Services, Inc. (collectively, "Sunrise"). Their claims are based on alleged wage and hour violations with respect to current and former non-exempt, hourly employees of Sunrise in California. The consolidated class action complaint advances nine causes of action for alleged violations of: (i) California Labor Code §§ 226.7 and 512(a) (failure to provide required meal periods); (ii) California Labor Code § 226.7 (failure to provide rest breaks); (iii) California Labor Code §§ 510 and 1198 (failure to pay overtime); (iv) California Labor Code §§ 1194, 1197, 1197.1 (failure to pay minimum wage); (v) California Labor Code §§ 201 and 202 (failure to pay wages upon discharge); (vi) California Labor Code § 226(a) (failure to provide accurate wage statements); (vii) California Labor Code §§ 226, 1174 (failure to maintain required records); (viii) California Business and Professions Code § 17200 *et seq*.; and (ix) California Labor Code § 2698 *et seq.* (penalties under the Private Attorneys General Act, as a representative action). Compl., Dkt. 56.

Plaintiffs brought a motion seeking to certify nine subclasses of approximately 11,700 non-exempt, hourly employees who have worked for Sunrise in California since February 25, 2009 (the "Class Certification Motion"). Dkt. 83 at 7. Sunrise has filed motions to exclude the declarations of Matthew Matern (the "Matern Motion," Dkt. 93) and Dr. James Lackritz (the "Lackritz Motion," Dkt. 94), which were filed by

Plaintiffs in support of the Class Certification Motion. Both parties also filed a number of evidentiary objections (Dkt. 91-9, 132-4, 132-6), which are addressed in separate orders.

On April 28, 2014, the Court conducted a hearing on the Motions and took them under submission. For the reasons stated in this Order, the Class Certification Motion, the Matern Motion, and the Lackritz Motion is each GRANTED IN PART.

## II. Factual Background

### A. In General

Sunrise is a "provider of senior living services, including independent living, assisted living, and care for individuals with Alzheimer's and other forms of memory loss." Declaration of Jennifer Delise ("Delise Decl."), Dkt. 91-4, ¶ 3. Sunrise currently operates 41 communities located throughout California. *Id*. ¶ 4. Prior to certain divestitures, the dates of which have not been provided, Sunrise had 59 locations in California. *Id*. Sunrise employs individuals who work in a range of positions at these communities. They include Care Managers, who are responsible for providing "hands on care" and "physical and emotional support" to particular residents. Delise Decl. ¶ 6; Declaration of Melissa Grant ("Grant Decl."), Dkt. 110, Exh. 11.

Tameifuna was employed as a non-exempt Care Manager, Lead Care Manager, and Medical Manager from May 25, 2009 to May 15, 2012 at the Sunrise location in Palo Alto, California. Declaration of Renee Tameifuna ("Tameifuna Decl."), Dkt. 78-2, ¶ 2. Shiferaw was employed as a non-exempt Care Manager and Lead Care Manager from approximately June 2010 through June 2013 at the Sunrise retirement community in Beverly Hills, California. Declaration of Betelhem Shiferaw ("Shiferaw Decl."), Dkt. 78-5, ¶ 2. Certain of Plaintiffs' proposed subclasses are limited to Care Managers; others include those who have held different jobs.

### B. Timekeeping

To track time worked by employees, Sunrise communities use an electronic timekeeping system called Kronos. Delise Decl. ¶ 7. It requires an employee to apply his or her finger to a device that recognizes his or her fingerprint. Based on that recognition, Kronos records the time the recognized employee started and stopped work and when he or she took meal periods. *Id.* Rest breaks are not recorded. *Id.* When corrections to the Kronos records are necessary, employees use correction sheets, called "Time Exception Reports." *Id.* ¶ 8. Such forms may be filled out when an employee forgets to clock in or out or experiences an error with the Kronos system. *Id.*

Sunrise has a policy of rounding the time entries by employees to the nearest quarter hour. Grant Decl., Exh. 6, Delise Depo. 36:17-37:14. Under this policy, when an employee "punches in" up to 7 minutes after the quarter hour, the entry is rounded back to the nearest quarter hour. When an employee punches in more than 7 minutes after the quarter hour, the entry is rounded forward to the nearest quarter hour. *Id.*

### C. Meal and Rest Periods

Sunrise has official meal and rest break policies. They provide that employees are to receive an unpaid 30-minute uninterrupted meal break for every five-hour shift, and a ten-minute paid rest break for every four hours, or major portion thereof, that they work. Delise Decl., Exh. A-1. However, Plaintiffs and other putative class members claim that they have not been provided rest or meal periods in compliance with California law. Thus, some claim that they did not receive second rest periods during shifts of between 6 and 8 hours (Tameifuna Decl. ¶ 12; Shiferaw Decl. ¶ 11), others claim that their meal and rest breaks were interrupted or delayed due to emergency calls involving a resident (patient) in the community. Tameifuna ¶ 8; Shiferaw Decl. ¶ 10.

### D. Cross-over Meetings

Lead Care Managers -- and on certain occasions Care Managers -- at Sunrise are required to participate in "cross-over meetings." Grant Decl., Exh. 14; Shiferaw Decl. ¶ 12. Cross-over meetings occur at shift changes and generally last approximately 10 to 15 minutes. Grant Decl., Exh. 14. At these meetings, outgoing Lead Care Managers inform incoming Lead Care Managers of relevant information about residents. *Id*.; Shiferaw Decl. ¶¶ 12-13.

### E. Use of Communications Devices and Response to Resident Calls

Certain Sunrise employees are required to carry a communications device while they are working. Grant Decl., Exh. 6, Delise Depo. 56:9-57:18. In addition, Care Managers are required to respond quickly to calls for assistance by residents. *Id.*, Exh. 11. Plaintiffs claim that, as a result of these policies, they were denied uninterrupted meal and rest breaks. Shiferaw Decl. ¶ 10; Tameifuna Decl. ¶ 8.

### F. Staffing at Sunrise Communities

Sunrise provides software to assist department managers create schedules and determine how many staff members are necessary to meet the needs of the residents at any given time. Dkt. 135, Grant Supp. Decl., Exh. 9 (under seal); Dkt. 132-1, Grant Supp. Decl., Exh. 6, Pham Depo. 93:9-100:2; *id*., Exh. 7, Carlson Depo. 99:14-100:13; *id*., Exh. 3, Cherwin Depo. 23:17-25:21. This software generates "target hours" for each job position within each community. Grant Supp. Decl., Exh. 9. The "target hours" figure refers to the number of hours allotted to each job position during every 24-hour period. Pham Depo. 95:9-25.

Department managers are trained to attempt to staff their departments in a way that the total hours worked by those in each job position match the target number. *Id*. For example, if the target figure for Care Managers is 24 hours, and there are three shifts each of which is eight hours, a department manager can schedule one Care Manager for each of the shifts. Grant Supp. Decl., Exh. 9. However, department managers are given discretion with respect to the allocation of the total number of hours throughout the day. *Id.* So, if the target hours figure for Care Managers during a 24-hour period is 48 hours, then the department manager can schedule two Care Managers for each shift or, alternatively, can schedule more Care Managers for certain shifts and fewer on others, depending on resident needs at certain times of day. *Id*.; Pham Depo. 95:9-25.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

| | | | |
|---|---|---|---|
| Case No. | LA CV13-02171 JAK (PLAx) | Date | June 11, 2014 |
| Title | Betelhem Shiferaw v. Sunrise Senior Living Management, Inc., et al. | | |

For Care Manager positions, the target hours are based on the number of residents who live in a community as well as the expected levels of service. *Id*. For other positions, target hours are determined by the budget that has been approved for the community. *Id.* Plaintiffs contend that Sunrise's use of this software resulted in systematic understaffing, thereby preventing employees from taking compliant meal periods.

### G. Plaintiffs' Proposed Classes

Plaintiffs seek the certification of the following sub-classes:

Regular Rate Subclass: All persons who worked as non-exempt or hourly employees of Defendants at one or more of their locations in California at any time from February 25, 2009 to October 2010[1] who were paid a non-discretionary bonus and/or a retroactive pay increase during one or more pay periods in which they were also paid overtime wages;

Rounding Subclass: All persons who work or worked as non-exempt or hourly employees of Defendants at one or more of their locations in California at any time from February 25, 2009 until the date of the order granting class certification whose actual clock-in and clock-out time punches for their shifts were rounded to the nearest quarter hour;

Meal Period Rounding Subclass A: All persons who work or worked as non-exempt or hourly employees of Defendants at one or more of their locations in California at any time from February 25, 2009 until the date of the order granting class certification whose actual clock-in and clock-out time punches for at least one meal period were up to seven minutes before or after the quarter hour and whose meal period clock-in and clock-out time punches for that meal period were rounded to that quarter hour;

Meal Period Rounding Subclass B: All persons who work or worked as non-exempt or hourly employees of Defendants at one or more of their locations in California at any time from February 25, 2009 until the date of the order granting class certification whose actual clock-in and clock-out time punches for at least one meal period show a meal period between 38 and 44 minutes in length but whose clock-out and clock-in time punches were rounded to the nearest quarter hour;

Meal Period Subclass: All persons who work or worked as non-exempt or hourly employees of Defendants at one or more of their locations in California at any time from February 25, 2009 until the date of the order granting class certification whose time records show missed, late, or less than 30-minute meal periods for work periods of six hours or longer;

Rest Break Subclass: All persons who work or worked as non-exempt or hourly employees of Defendants at one or more of their locations in California at any time from February 25, 2009 until November 15, 2012 who worked for a period of time between six and eight hours or between ten and twelve hours;

1 At the hearing on the Motion, Plaintiffs amended the class period for this subclass from "February 25, 2009 until the date of the order granting class certification" to "February 25, 2009 to October 2010" based on the review of the workweek data provided by Defendants subsequent to the filing of the Motion. However, Plaintiffs did not provide a precise date in October.

On-Call Subclass: All Care Managers[2] who work or worked as non-exempt or hourly employees of Defendants at one or more of their locations in California at any time from February 25, 2009 until the date of the order granting class certification who were required to carry a pager, scout phone, or radio during their shifts;

Off-the-Clock Subclass: All Care Managers[3] who work or worked as non-exempt or hourly employees of Defendants at one or more of their locations in California at any time from February 25, 2009 until the date of the order granting class certification who participated in required "cross-over meetings" before or after an eight-hour shift; and

Rest Break Coverage Subclass: All persons who work or worked as non-exempt or hourly employees of Defendants at one or more of their locations in California at any time from February 25, 2009 until the date of the order granting class certification who worked at least one shift of three and a half hours or more.

Dkt. 83 at 10-12; Dkt. 132 at 13.

## III. Procedural Background

On February 25, 2013, Tameifuna filed a putative class action complaint against Sunrise and one of its former executive directors, Charmaine Doherty, in the Santa Clara County Superior Court. 2:13-cv-06294, Dkt. 1 at 6. On March 18, 2013, Shiferaw filed a similar action against Sunrise and one of its executive directors, Jason Malone, in Los Angeles County Superior Court. Dkt. 1 at 5. On March 26, 2013, Sunrise removed both actions. The Tameifuna action was removed to the Northern District of California, and the Shiferaw action removed to the Central District of California. *Id.*; 2:13-cv-06294, Dkt. 1. The Shiferaw action was assigned to this Court pursuant to General Order 08-05 because it presided over a prior, similar action. *Purnell v. Sunrise Senior Living Management, Inc., et al.*, 8:10-cv-00897-JAK-MLG. Dkt. 8.

On August 27, 2013, the Tameifuna action was transferred from the Northern District of California to the Central District pursuant to a stipulation entered by Sunrise and Tameifuna. 2:13-cv-06294, Dkt. 43. It was assigned to this Court pursuant to General Order 08-05. 2:13-cv-06294, Dkt. 47. On September 27, 2013, Shiferaw, Tameifuna, and Sunrise filed a stipulation to consolidate the Shiferaw and Tameifuna actions. Dkt. 53. That stipulation was granted and the matters were consolidated on October 15, 2013. Dkt. 54.

## IV. Analysis

### A. Class Certification Motion

2 Plaintiffs narrowed the On-Call Subclass from "[a]ll persons" to "[a]ll Care Managers" in their reply to the Class Certification Motion. Dkt. 132 at 13.
3 Plaintiffs narrowed the subclass definition from "[a]ll persons" to "[a]ll Care Managers" at the hearing on the Class Certification Motion.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV13-02171 JAK (PLAx) | Date | June 11, 2014 |
| Title | Betelhem Shiferaw v. Sunrise Senior Living Management, Inc., et al. | | |

1. Legal Standard

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes et al.*, 131 S. Ct. 2541, 2550 (2011). Under Rule 23 of the Federal Rules of Civil Procedure, a class "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982)*; Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). These are: (i) numerosity, (ii) commonality, (iii) typicality, and (iv) adequacy of representation. Fed. R. Civ. P. 23(a). Further, "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart*, 131 S. Ct. at 2551 (italics in original). That "rigorous analysis" will "frequently" include "some overlap with the merits of the plaintiff's underlying claim." *Id*.

Upon determining that these four prerequisites are satisfied, a court must next consider whether the proposed class meets the standards of Rule 23(b). *See, e.g.*, *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Plaintiffs seek certification under Rule 23(b)(3). It requires that: (i) "questions of law or fact common to the class members predominate over any questions affecting only individual members," and (ii) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

2. Application

a) Numerosity

Rule 23(a)(1) requires that "the class [be] so numerous that joinder of all members is impracticable." Plaintiffs have provided evidence that there are approximately 11,691 putative class members. Grant Decl., Exh. 15 (Defendant's Responses to Interrogatories). This is sufficient to make joinder of all class members impracticable. Sunrise does not dispute that the numerosity requirement has been met.

b) Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." "[T]he typicality requirement is permissive and requires only that the representative's claims are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010).

Plaintiffs contend they are typical of those in the putative classes because they were non-exempt employees who worked at the California communities operated by Sunrise during the relevant time periods. Plaintiffs, like other putative class members, allege that they were not paid overtime at their regular rate of pay, were not paid for all hours worked pursuant to Defendants' rounding policy, missed all or part of their meal or rest breaks, and worked off-the-clock without compensation. *See* Tameifuna Decl. ¶¶ 2-15; Shiferaw Decl. ¶¶ 2-15. These claims are within the range of what is allegedly typical of

members of the class. Sunrise does not dispute that the typicality requirement is met. For these reasons, the typicality requirement is satisfied.

c) Adequacy

Rule 23(a)(4) requires that "the representative parties . . . fairly and adequately protect the interests of the class." The adequacy inquiry consists of two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

Plaintiffs contend that, to this point in the litigation, they have fairly represented the putative class by sitting for depositions, reviewing written discovery, and working closely with their attorneys. Tameifuna Decl. ¶¶ 16-20; Shiferaw Decl. ¶¶ 16-20. Moreover, they assert that there are no conflicts of interest between them and the members of the putative classes. Dkt. 83 at 30. Plaintiffs are represented by counsel who are well-qualified to represent the class. Thus, proposed class counsel specialize in wage-and-hour litigation, and have significant experience in class action matters. *See* Declaration of Raul Perez ("Perez Decl."), Dkt. 78-7, ¶¶ 3-4; Declaration of Mattew Matern ("Matern Decl."), Dkt. 86, ¶¶ 20, 22.

Sunrise does not dispute that Plaintiffs and their counsel will adequately represent the subclasses, with two exceptions. First, Sunrise contends that the Plaintiffs are not adequate representatives of the Regular Rate Subclass because collectively they only received three types of bonuses -- spot bonuses, retroactive pay, and a $35 holiday gift -- of the 20 types of bonuses that may be considered when determining an employee's regular rate. Dkt. 91 at 29. However, Sunrise has not demonstrated that this will create conflict of interest between Plaintiffs and the Regular Rate Subclass.[4] And, the cases cited by Sunrise do not demonstrate otherwise. In *Flores v. CVS Pharmacy, Inc.*, 2:07-CV-05326-JHN-EX, 2010 WL 3656807 (C.D. Cal. Sept. 7, 2010), the plaintiff was found to not be typical of the regular rate class because the defendant produced evidence that she had not been injured by the alleged policies related to shift premiums and overtime calculations. *Id.* at *8. Similarly, in *E. Texas Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395 (1977), the Supreme Court found that the plaintiffs, who sought to represent a class of African-American and Mexican-Americans who had allegedly been denied positions as "line drivers" because of their race or national origin, "lacked the qualifications to be hired as line drivers." *Id.* at

4 At the hearing on the Motions, Sunrise also argued that this demonstrated a lack of typicality as to the Regular Rate Subclass. However, "the typicality requirement is permissive and requires only that the representative's claims are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Rodriguez,* 591 F.3d at 1124. Here, Plaintiffs' claim that their overtime pay was not calculated using their regular rate of pay is identical to the claims of the other class members. Each class member was allegedly subject to the same improper method of calculating overtime pay. To the extent other class members were paid different bonuses than those awarded to Plaintiffs, the distinction between Plaintiffs and the class would only be as to the alleged severity of the claimed harm. This is not sufficient to show a lack of typicality. *See Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. 2001) ("We do not insist that the named plaintiffs' injuries be identical with those of the other class members, only that the unnamed class members have injuries similar to those of the named plaintiffs and that the injuries result from the same, injurious course of conduct.").

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-02171 JAK (PLAx) | Date | June 11, 2014 |
|---|---|---|---|
| Title | Betelhem Shiferaw v. Sunrise Senior Living Management, Inc., et al. | | |

403. Therefore, these plaintiffs "could have suffered no injury as a result of the alleged discriminatory practices." *Id*. Here, by contrast, Plaintiffs have alleged an injury that resulted from the regular rate policies used by Sunrise. That they may not have been awarded all possible bonuses only demonstrates a difference in the severity of the alleged injury, not a lack of adequacy.

Second, Sunrise contends that Shiferaw is not an adequate representative of the Off-the-Clock Subclass because she never worked off-the-clock. Dkt. 91 at 25. Sunrise does not dispute, however, that Tameifuna is an adequate representative of the Off-the-Clock Subclass. And, as discussed below, the Court declines to certify the Off-the-Clock Subclass for failure to meet the predominance requirement of Rule 23(b)(3).

For these reasons, the adequacy requirement is met.

d) Commonality and Predominance

The commonality requirement is satisfied only where the claims of class members "depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 131 S. Ct. at 2551. "Claims alleging that a uniform policy consistently applied to a group of employees is in violation of the wage and hour laws are of the sort routinely, and properly, found suitable for class treatment." *Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004, 1033 (2012); *see also Kurihara v. Best Buy Co., Inc.*, C 06-01884 MHP, 2007 WL 2501698, at *10 (N.D. Cal. Aug. 30, 2007)(a "mere allegation of a company-wide policy does not compel class certification," but certification is appropriate where evidence is presented of the existence of a company-wide policy); *In re AutoZone, Inc., Wage & Hour Employment Practices Litig.*, 289 F.R.D. 526, 534 (N.D. Cal. 2012) (finding that common questions predominated where a subclass's claims were based entirely on the legality of Defendant's uniform written rest break policy).

"Even if Rule 23(a)'s commonality requirement may be satisfied **. . .** the predominance criterion is far more demanding." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* at 623. "Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Thus, the Court must pragmatically assess whether the central issues in the action predominate over issues particular to individual class members. *Romero v. Producers Dairy Foods, Inc*., 235 F.R.D. 474, 489 (E.D. Cal. 2006).

Plaintiffs argue that common questions predominate as to the claims advanced because Sunrise has implemented the following common policies: (i) not paying its employees overtime wages at their regular rate of pay; (ii) rounding employees' recorded time punches in a manner that resulted in underpayment; (iii) prohibiting employees from voluntarily choosing to forgo meal periods; (iv) failing to provide the required rest breaks for shifts of more than six hours; (v) requiring Care Managers to carry communications devices during their shifts and to respond to emergency calls received on those devices during scheduled meal and break periods; (vi) requiring Care Managers to attend "cross-over meetings"

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

| Case No. | LA CV13-02171 JAK (PLAx) | Date | June 11, 2014 |
|---|---|---|---|
| Title | Betelhem Shiferaw v. Sunrise Senior Living Management, Inc., et al. | | |

before their shifts began or after they ended; and (vii) understaffing so that meal and rest periods could not be provided.

(1) Regular Rate Subclass

Under California law, overtime work must be paid at a rate of "no less than one and one half times the regular rate of pay" for that employee. Cal. Lab. Code § 510(a); California IWC Wage Order No. 5 § 3(A)(1). The California Labor Code does not define the term "regular rate of pay." The California Division of Labor Standards Enforcement ("DLSE") recommends that courts look to the Fair Labor Standards Act ("FLSA") and adopt its definition of "regular rate of pay." DLSE Manual § 49.1.2 ("In determining what payments are to be included in or excluded from the calculation of the regular rate of pay, California law adheres to the standards adopted by the U.S. Department of Labor").[5] Under the FLSA, "[t]he regular hourly rate of pay of an employee is determined by dividing his total remuneration for employment . . . in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid" (29 C.F.R. § 778.109).

Pursuant to these standards, an employee's regular rate of pay may not be the same as his or her base hourly rate. For example, nondiscretionary bonuses and retroactive pay increases are included in determining an employee's regular rate of pay. Thus, "[w]hen the amount of [a] bonus can be ascertained, it must be apportioned back over the workweeks of the period during which it may be said to have been earned. The employee must then receive an additional amount of compensation for each workweek that he worked overtime during the period." *Marin v. Costco Wholesale Co*., 169 Cal. App. 4th 804, 807 (2008) (quoting 29 C.F.R. § 778.209(a) as support for the conclusion that, under California law, retroactive overtime pay is needed upon receipt of a bonus earned over an extended period of time); *see also* 29 C.F.R. § 778.303 ("Where a retroactive pay increase is awarded to employees . . . it operates to increase the regular rate of pay of the employees for the period of retroactivity.").

*(a) Commonality*

Plaintiffs contend that Sunrise had a policy of not paying its employees overtime at their respective, regular rates of pay. The employee handbooks of Sunrise state that it pays overtime wages based on the hourly base rate, not the regular rate of pay. *See* Delise Decl., Exh. A-1 to A-4, Team Member Handbooks ("Non-exempt team members will receive overtime pay at a rate of one and one-half times their hourly base rate of pay."); Grant Decl., Exh. 3, Sunrise Manager's Guide to Overtime (employees "receive overtime pay which is 1 ½ times the base rate for all hours."); *Id*., Exh. 4, November 23, 2009 HR News

---

5 The DLSE Manual does not have the force of law if it concerns "a regulation within the meaning of the APA because it was a standard of general application interpreting the law the DLSE enforced and because it was not merely a restatement of prior agency decisions or advice letters." *Tidewater Marine Western, Inc. v. Bradshaw*, 14 Cal.4th 557, 573 (1996). However, a court may adopt a DLSE statutory interpretation embodied in a void regulation if it independently determines that the interpretation is correct. *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal.4th 554, 563 (2007). Here, the parties agree that federal law defining and interpreting "regular rate" under the FLSA governs. This is consistent with DLSE § 49.1.2 and other California authority. *Advanced-Tech Sec. Servs., Inc. v. Superior Court*, 163 Cal. App. 4th 700, 707 (2008) (noting that California courts "frequently refer[] to . . . federal precedent in interpreting parallel language in state labor legislation" and applying the federal definition of "regular rate" of pay to an employee's claim under Cal. Lab. Code § 510(a)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

| | | | |
|---|---|---|---|
| Case No. | LA CV13-02171 JAK (PLAx) | Date | June 11, 2014 |
| Title | Betelhem Shiferaw v. Sunrise Senior Living Management, Inc., et al. | | |

Communication (explaining that the Kronos timekeeping system calculated overtime pay at the "base rate of pay"). Plaintiffs' expert contends, based on his review of the workweek data provided to him, Sunrise employees were not paid the regular rate required by law for the period between February 2009 and October 2010. Declaration of Jim Lackritz ("Lackritz Decl.") ¶¶ 18-21, Dkt. 78-6; *Id.*, Exh. A; Dkt. 132-2, Supplemental Declaration of Jim Lackritz ("Lackritz Supp. Decl."), Exh. A ¶ d.

Sunrise argues that its use of the term "hourly base rate" was merely a colloquialism, and that its time and payroll systems were programmed to use the regular rate of pay to calculate overtime wages. Further, Sunrise states that its regular rate calculation includes all bonuses and retroactive pay increases, notwithstanding that it is not required by law to include discretionary bonuses in the calculation. Grant Decl., Exh. 5, Deposition of Kathleen Cherwin ("Cherwin Depo.") 74:22-75:7, 81:10-20, 9:17-97:13, 100:22-24, 118:10-20, 139:6-141:11; *id.*, Exh. 6, Deposition of Jennifer Delise ("Delise Depo.") at 159:3-160:19, 184:17-185:17.

The dispute whether the regular rate calculation includes all bonuses and retroactive pay increases is an issue that is appropriate for determination during the merits phase of the litigation. Nevertheless, the evidence presented at this phase of the proceedings demonstrates that Sunrise had a uniform policy with respect to the calculation of the appropriate rate of pay for overtime wages. The claims of putative class members, therefore, share a common issue: Whether the method used to calculate the rate of pay violated California law. For this reason, common questions are raised as to how Sunrise calculated the overtime rates and whether this method of calculation complies with California law.

*(b) Predominance*

Defendants argue that, even if a common question exists as to how overtime rates were calculated, individual issues predominate on this claim. Thus, it argues that the putative class includes 20 different bonus and payment categories. For example, "spot bonuses" are paid on a case-by-case basis for employees who go "above and beyond." Cherwin Depo. 83:7-8:23, Dkt. 121-8; Delise Decl., Exh. F, Dkt. 107-2 (Sunrise "Corporate Policy" stating that spot bonuses "are after-the-fact rewards or payments for which there are no promises or prior agreements"). Sunrise contends that individualized inquires would be required to determine whether each of these "spot bonuses" was discretionary in nature. This argument is not persuasive. The evidence presented by Sunrise demonstrates that managers used certain criteria to determine whether to award a "spot bonus." These criteria can be evaluated to determine whether "spot bonuses," as a category, were discretionary. Delise Decl., Exh. F.

Sunrise also contends that inquiries would have to be made into whether each of the other bonus categories involved discretionary decision-making. However, these inquiries, even if they must be made, can be determined across the class rather than on an individual basis. Sunrise has submitted no evidence to support the claim that the award and payment of these bonuses was discretionary as to certain class members and non-discretionary as to others. Therefore, the question whether a given bonus category is discretionary is an issue that is common to the class and will not depend on individualized, factual inquiries. *See Alonzo v. Maximus, Inc.*, 832 F. Supp. 2d 1122, 1133 (C.D. Cal. 2011) (determining that spot bonuses were discretionary as a matter of law); *Provine v. Office Depot, Inc.*, C 11-00903 SI, 2012 WL 2711085 (N.D. Cal. July 6, 2012) (making a determination whether bonuses were discretionary at summary judgment).

For these reasons, Sunrise's policies give rise to common questions amenable to classwide determination. Whether certain bonuses were discretionary in nature and whether Sunrise included retroactive pay raises and nondiscretionary bonuses in its calculation of overtime rates are issues that can be addressed as to the entire class. The Class Certification Motion is GRANTED as to the Regular Rate Subclass.

(2) Rounding Subclass

California law "permits employers to use a rounding policy for recording and compensating employee time as long as the employer's rounding policy does not 'consistently result[] in a failure to pay employees for time worked.'" *See's Candy Shops, Inc. v. Superior Court*, 210 Cal. App. 4th 889, 901 (2012) (adopting the federal rounding standard for claims under the California Labor Code and quoting *Alonzo v. Maximus, Inc*., 832 F. Supp. 2d 1122, 1126 (C.D. Cal. 2011) (quoting 29 C.F.R. 785.48(b))). Under these standards, a rounding policy is lawful if it is "fair and neutral on its face and 'it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked." *See's Candy Shops, Inc*., 201 Cal. App. 4th at 907.

*(a) Commonality*

Plaintiffs contend that common issues predominate as to this claim and subclass because Sunrise has maintained a uniform rounding policy with respect to recorded time punches. As noted, Plaintiffs claim that, under the policy, time punches up to 7 minutes after the quarter hour are rounded back to the nearest quarter hour, and time punches more than 7 minutes after the quarter hour are rounded forward to the nearest quarter hour. Grant Decl., Exh. 6, Delise Depo. at 37:5-38:7 (explaining that the Kronos timekeeping system has been programmed to round time punches to the nearest quarter hour during the class period). Furthermore, Plaintiffs contend that Sunrise did not allow subclass members to clock in for their shifts more than seven minutes before they started or to clock out more than seven minutes after their shifts ended. Grant Decl., Exh. 2, 2003 California Supplement: Team Member Handbook (employees "should clock in not more than seven (7) minutes prior to the beginning of your shift and clock out not more than seven (7) minutes after the end of your shift unless you. . . are authorized to work overtime by your department coordinator or executive director"); Tameifuna Decl. ¶¶ 6-7; Shiferaw Decl. ¶¶ 6-7. Finally, Plaintiffs argue that Sunrise expected its employees to work during the entire time between clocking in and out for a shift. Dkt. 83 at 18. For these reasons, Plaintiffs contend that Sunrise's policy is not facially neutral because it allows employees to clock in or up to seven minutes early and to clock out more than seven minutes late (both of which benefit the employer), but does not permit them to clock in more than seven minutes early or clock out more than seven minutes late (which would benefit the employee).

In response, Sunrise argues that the claimed policy with respect to precluding early clock-ins or late clock-outs is not a uniform one. Indeed, the policy on which Plaintiffs base their claim states that employees should not clock in early or clock out late "unless [they] are authorized to work overtime by [their] department coordinator or executive director." Grant Decl., Exh. 2, 2003 California Supplement: Team Member Handbook. Based on this language, Sunrise contends that the policy is not uniform on its face. Further, whether employees are authorized to work overtime depends on individual circumstances

and determinations. *See* Richmond Decl. ¶ 7; Grenier Decl. ¶ 12; Acosta Decl. ¶ 14; Ieremia Decl. ¶ 19; Nunes Decl. ¶ 11; Panuco Decl. ¶ 15; K. Sanchez Decl. ¶ 25. Sunrise also points out that the handbook cited by Plaintiffs is from 2003, which is several years prior to time specified for the class. By contrast, the handbook that was in use throughout that class period does not use the "seven minute" language. Rather, it provides, "team members should not clock in prior to beginning their shift and must clock out at the conclusion of their shift unless authorized to work overtime by their Supervisor/Coordinator or Executive Director." Delise Decl., Exh. E at 4.

Notwithstanding the absence of the "seven minute" language in the new handbooks, Plaintiffs contend that the policy was not neutral. They argue that certain class members clocked in a few minutes early to ensure that they would be at their workstations on time, or may have clocked out a few minutes late. However, they were not permitted to clock in a few minutes late, clock out a few minutes early, or clock out more than seven minutes after the end of their shifts. Further, Plaintiffs argue that a failure to abide by the policy for clocking in and out could result in disciplinary action, including termination. *See* Delise Decl., Exh. E at 4 ("[T]eam members who work overtime without prior approval are subject to discipline up to and including termination."); Christiansen Decl., Exh. G (employee Performance Counseling & Improvement Plan citing "failure to follow departmental policy: late arrival, early departure" as reason for disciplinary action); *id*., Exh. I (same); Kaake Decl., Exh. A ((employee Performance Counseling & Improvement Plan citing tardiness as reason for disciplinary action). As a result, the rounding policy was not neutral because Plaintiffs could not take advantage of the rounding policy.

Plaintiffs have also submitted evidence supporting their claim that the rounding policy resulted in underpayment to class members. *See* Dkt. 132-2, Lackritz Supp. Decl., Exh. A ¶ a; *see also* Dkt. 132-1, Grant Supp. Decl., Exh. 1, Ward Depo. 87:17-25; 138:3-21. Plaintiff's expert opines that, for 65.2% of the Rounding Subclass, the total hours worked using the actual time punch was higher than the totals using the rounded time entries. Lackritz Supp. Decl., Exh. A ¶ a. Among all employees, "the total differential in the actual versus rounded time entry hours works out to be 36,552 hours, for an average of 3.45 hours per employee" that was not compensated as a result of the rounding policy. *Id*.

The evidence submitted by Plaintiffs and Sunrise demonstrates that common policies existed regarding the rounding of time punches and the time at which employees were required to clock in and out. For these reasons, common issues exists, including: (i) whether Sunrise had a policy of rounding time punches to the nearest quarter hour; (ii) whether employees were prohibited from clocking into their shifts early or out of their shifts late; (iii) whether Sunrise employees were required to work during the entire time between clocking in and out; and (iv) whether collectively these factors "consistently result[ed] in a failure to pay employees for time worked."

*(b) Predominance*

Individual issues will predominate in resolving the claims of the Rounding Subclass. Sunrise argues that whether and when employees clocked in more than seven minutes prior to, or clocked out more than seven minutes after, their shifts varied by individual. *See* Dkt. 78-8, Exh. 21, Withers Decl. ¶ 8; Davie Depo. 256:10-14; Venturelli Decl. ¶ 6; DeBernardi-Lieber Decl. 13; Olivares Decl. ¶ 2; Serrano Decl. ¶ 14; Koester Decl. ¶ 15. Sunrise has demonstrated that some variation exists as to whether employees were actually working when they had clocked in before their shifts started or had clocked out after their shifts

ended. For example, Sunrise has presented evidence that some employees clocked in early, but spent that time talking to residents or other co-workers (Worku Depo. at 126:4-16); drinking coffee (Baker Decl. ¶ 17; Oliver Decl. ¶ 14; Reed Decl. ¶ 6; Bohannan Decl. ¶ 9); waiting for their shifts to start (Panuco Decl. ¶ 13); or talking on their phones (Cox Decl., Exh. B at 0553; Delise Decl., Exh. I at 32). Therefore, Sunrise has demonstrated that individualized inquiries would be required to determine whether employees were actually working or were under the control of Sunrise during those times when they clocked in early or clocked out late.

Moreover, the time entries by themselves do not demonstrate that proposed subclass members must be paid for the time spent between the time punch and the employee's scheduled start time. *See See's Candy,* 210 Cal.App.4th at 910–11 ("To the extent an employee claims that he or she was not properly paid [for the time during which an employee punches in before his or her compensable pay is triggered], this claim raises factual questions involving whether the employee was in fact working and/or whether the employee was under the employer's control during the grace period."); *Forrand v. Fed. Exp. Corp.*, CV 08-1360 DSF PJWX, 2013 WL 1793951 (C.D. Cal. Apr. 25, 2013) (individual factual inquiries predominate over classwide inquiries as to whether employees were working or under the control of their employer while they were clocked in prior to or after their shifts). Through the evidence presented, Sunrise has shown that resolution of the legal question whether Sunrise's rounding policy resulted in a failure to pay employees for time worked would involve numerous individualized inquiries.

Plaintiffs respond that Jennifer Delise, Sunrise's Rule 30(b)(6) designee, stated in her deposition that once an employee clocks in, even if it takes him or her five minutes to walk from the clock-in location to his or her workstation, the time is "compensable time." Supp. Grant Decl., Exh. 4, Delise Depo. 43:16-44:17. Plaintiffs also argue that certain Sunrise managers testified that employees are considered to be working as soon as they clock in. *See* Supp. Grant. Decl., Exh. 5, Kaake Depo. 55:18-56:13 ("[O]nce you clock in, you're on the clock."); *id.*, Exh. 14, Reed Depo. 191:15-22 ("Q: when you're punched in, you're doing work; correct? A: Yes.").

The deposition testimony cited by Plaintiffs does not establish that everyone in the Subclass was working, was expected to be working, or was subject to Sunrise's control during the time they were clocked before their shifts began or after they ended. Rather, the testimony relates to the specific practice of particular managers or to those circumstances when particular employee proceeded directly to his or her work station after clocking in prior to the commencement of a shift. As noted in *Forrand*, 2013 WL 1793951, at *2, a claim for unpaid work requires a determination "whether the level of [the employer's] control over employees within the proposed general class when they are on-the-clock but off-shift is sufficient to render the on-the-clock but off-shift time compensable under California law" in determining whether Rule 23 certification is proper. 2013 WL 1793951, at *2. This rule applies to claims for unpaid work due to an allegedly unfair rounding policy. *See See's Candy Shops, Inc. v. Superior Court*, 210 Cal. App. 4th 889, 907-08 (2012) (claim for unlawful rounding policy requires foundational evidence showing that employees were working when they were clocked in but not being paid due to rounding). The depositions cited by Plaintiffs do not show that the members of the proposed Subclass were subject to control by Sunrise when they were clocked in for a time period for which they were not paid. Plaintiffs, who bear the burden to show that class certification is appropriate, have not submitted any additional evidence as to this issue.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

| | | | |
|---|---|---|---|
| Case No. | LA CV13-02171 JAK (PLAx) | Date | June 11, 2014 |
| Title | Betelhem Shiferaw v. Sunrise Senior Living Management, Inc., et al. | | |

Plaintiffs contend that this case is different from *See's Candy* and *Forrand*. They argue that, in those cases, evidence was presented that the employer considered the time when employees were clocked in before or after their shifts to be "personal time." Plaintiffs argue that Sunrise has submitted no such evidence. However, as discussed above, Sunrise has submitted declarations from putative class members in which the declarants have stated that class members treated this time as personal time. The evidence cited by Plaintiffs does not directly contradict the declarations of these class members, and does not show that these class members were under the control of Sunrise during those times.

For these reasons, Plaintiffs have not met their burden of demonstrating that this is a claim for which common questions predominate. *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) ("[A] party seeking to maintain a class action must affirmatively demonstrate his compliance with Rule 23"). Therefore, the Class Certification Motion is DENIED as to the Rounding Subclass.

(3) Meal Period Rounding Subclass

California Labor Code Section 512(a) provides:

> An employer may not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes, except that if the total work period per day of the employee is no more than six hours, the meal period may be waived by mutual consent of both the employer and the employee…

"If an employer fails to provide an employee a meal period in accordance with the applicable provisions of the [Wage] Order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation [a "meal period premium"] for each work day that he meal period is not provided." 8 Cal. Regs. Code § 11050, subd. 11(B).

*(a) Commonality*

Plaintiffs contend that employees did not receive required meal breaks due to Sunrise's uniform policy of rounding time punches to the quarter hour. Meal Period Subclass A consists of employees whose actual clock-in and clock-out time punches were less than seven minutes before or after the quarter hour and whose meal period clock-in and clock-out time punches for that meal period were rounded down to the quarter hour. As a result of this rounding, employees whose actual meal periods were less than the required 30 minutes were paid as if they were provided a compliant meal period. Lackritz Decl., Exh. A. Plaintiff contends that this rounding policy has resulted in Sunrise's failure to pay Meal Period Subclass A members for meal period premiums and time worked.

Meal Period Rounding Subclass B consists of employees who clocked in or out from their meal periods more than seven minutes prior to or after the quarter hour and whose time punches were rounded up to treat their meal period as longer than it actually was. Plaintiffs contend that because their time punches were rounded up, these employees were "shorted pay" for seven minutes of time actually worked. Grant Decl., Exh. 1, Polgar Depo. at 170:6-171:5.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV13-02171 JAK (PLAx) | Date | June 11, 2014 |
| Title | Betelhem Shiferaw v. Sunrise Senior Living Management, Inc., et al. | | |

As with the Rounding Subclass, the commonality requirement is met for the claims of both of these subclasses with respect to the alleged nonpayment for time worked. Thus, Sunrise has an official policy of rounding time punches to the nearest quarter hour. A common question exists as to whether this policy "consistently result[ed] in a failure to pay employees for time worked." *See's Candy Shops, Inc.*, 210 Cal. App. 4th at 901.

In contrast, commonality has not been shown as to the claim for meal period premiums for Meal Period Subclass A. The claims for nonpayment for time worked only require a determination of how much time elapsed between the time when the employee clocked in or out for the meal period and the rounded time. By contrast, the meal period premium claim requires a threshold determination that Sunrise failed to provide class members with compliant meal periods. *See* 8 Cal. Regs. Code § 11050, subd. 11(B). Thus, Plaintiffs fail to account for circumstances in which Sunrise provided a compliant meal period, but the employee elected to take a shorter meal break. Under those conditions, the employee may be entitled to claim nonpayment for time worked, *e.g*., the difference between his time punches and the rounded time, but may not be entitled to a meal period premium. Therefore, an assessment whether the meal period premium claim is appropriate for classwide determination requires Plaintiffs not only to show a policy that resulted in the "shorting" of the pay of class members when they took shorter meal periods, but also a policy that resulted in the denial of compliant meal periods.

Plaintiffs have not presented evidence to support a showing that the rounding policy caused class members to miss meal periods or to take shorter ones. Nor have they shown the rounding policy caused class members to go unpaid for meal period premiums they were owed, because the decision whether such a premium is owed is not made mechanically through the Kronos system based on rounded time punches. Rather, it is made on a case-by-case basis by supervisors or managers in each community. *See* Dkt. 121-1, Cox. Decl., Exh. E, Delise Depo. 153:23-154:2, 198:2-17; *id*., Exh. G, Polgar Depo. 77:24-78:10; *id*., Exh. H, Malone Depo. 19:8-20:4, 45:21-47:7. This determination is made after considering a time exception form completed and submitted by the employee along with the employee's time records and the circumstances surrounding the missed meal period. *Id.*, Exh. G, Polgar Depo. 77:24-78:10; *id*., Exh. H, Malone Depo. 19:8-20:4, 45:21-47:7. Therefore, the determination whether meal period premiums are owed does not turn on a common contention related to the rounding policy.

For these reasons, Plaintiffs have shown commonality as to their claims for nonpayment for time worked as to the Meal Period Rounding Subclasses. However, they have not shown commonality as to the meal premium claim of Meal Period Rounding Subclass A.

*(b) Predominance*

Sunrise has not presented evidence that individual issues will predominate over the common question whether the rounding policy consistently resulted in a failure to pay for time worked. There is no evidence presented that employees who clocked in at the end of their meal period were not working or under the control of Sunrise for the time allegedly lost due to the rounding policy. Therefore, the predominance requirement is satisfied as to the claims for nonpayment for time worked by the Meal Period Rounding Subclasses. For these reasons, the Class Certification Motion is GRANTED as to the claims for nonpayment for time worked for the Meal Period Subclasses and DENIED as to the claim for meal period premiums.

(4) Meal Period Subclass

"A meal period of not less than 30 minutes must be provided within the first five hours of work." Cal. Lab. Code § 512(a); *see also Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004, 1041 (2012) ("We conclude that, absent waiver, section 512 requires a first meal period no later than the end of an employee's fifth hour of work, and a second meal period no later than the end of an employee's 10th hour of work.").

*(a) Commonality*

Sunrise's California meal period policy provides: "There is no circumstance under which a team member whose workday is more than six (6) hours but less than ten (10) hours may waive a meal period. There is also no circumstance under which a team member whose workday is more than twelve hours may waive a meal period." Grant Decl., Exh. 2. Plaintiffs contend that any missed, late, or shortened meal periods were the result of this policy. Dkt. 82 at 21.

This policy does not, on its face, violate California law. Nevertheless, Plaintiffs apparently claim that, because Sunrise had a uniform policy prohibiting employees from waiving meal breaks for shifts of 6 to 10 hours in length, any missed meal break in the time records "leads inexorably to the conclusion" that Sunrise failed to provide a meal break. *Ordonez v. Radio Shack, Inc.*, CV 10-7060-CAS JCGX, 2013 WL 210223 (C.D. Cal. Jan. 17, 2013) (denying a class certification motion premised on the same theory). Plaintiffs have not provided evidence that missed meal periods were the result of Sunrise's meal period policy. Nor have Plaintiffs presented any evidence that Sunrise had a policy that required employees to forgo meal breaks. Thus, Plaintiffs' claim that the policy caused all meal period violations is unpersuasive and does not meet the standard of Rule 23.

The Court previously addressed a claim that Sunrise had a common policy of requiring employees to miss meal and rest breaks. *Purnell v. Sunrise Senior Living Management, Inc., et al*., SA CV10-000897 JAK (MLGx), Dkt. 89 (Feb. 27, 2012). In *Purnell*, plaintiff presented similar evidence of the policy of Sunrise as to meal breaks. *Id*. at 5. The Court concluded, as it does here, that the official meal break policy of Sunrise does not support the contention that its policy was for employees to miss meal breaks. *Id.*

This case is distinguishable from *Purnell* in that Plaintiffs have presented additional evidence, in the form of declarations of potential class members, regarding the meal period policy. Some of these former employees state that they were denied meal periods because of their heavy workload and inability to find another person who could perform their duties while they took a meal break. *See* Adcock Decl. ¶ 5; Dillard Decl. ¶ 5. Others stated that their meal breaks were interrupted by calls for assistance by residents of Sunrise. Davie Decl. ¶ 10; Jamar Decl. ¶ 12; Mendez Decl. ¶ 6. Others do not give a reason for the denial of the meal period. Davis Decl. ¶ 5. However, these declarations do not demonstrate the existence of a systematic policy requiring employees to miss or take shorter meal periods. Rather, these and the declarations submitted by Sunrise show that there are "numerous possibilities as to why certain employees may have had a late, short, or missed meal break during a given shift." *Ordonez*, 2013 WL 210223, at *6-8; *see also* Olivares Decl. ¶ 10 (driver who takes residents on full-day outings and chooses

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

| | | | |
|---|---|---|---|
| Case No. | LA CV13-02171 JAK (PLAx) | Date | June 11, 2014 |
| Title | Betelhem Shiferaw v. Sunrise Senior Living Management, Inc., et al. | | |

not to take meal periods because "would rather sit and eat with residents"); Dove Decl. ¶ 10 (for shorter shifts of 5 or 6 hours, she chooses not to take meal breaks); Adcock Decl. ¶ 5 (denied meal breaks because of heavy workload); Dillard Decl. ¶ 5 (denied meal breaks because was unable to find coverage).

In their reply to the Class Certification Motion, Plaintiffs sought to show the nexus among the claims of the Meal Period Subclass by arguing that missed or shortened meal periods were the result of common staffing policies adopted by Sunrise. Dkt. 132 at 17. In support of this position, Plaintiffs attached evidence in the form of the software used by Sunrise to help department managers determine staffing. Dkt. 135, Grant Supp. Decl., Exh. 9 (under seal); Dkt. 132-1, Grant Supp. Decl., Exh. 6, Pham Depo. 93:9-100:2; *id*., Exh. 7, Carlson Depo. 99:14-100:13; *id*., Exh. 3, Cherwin Depo. 23:17-25:21. Plaintiffs contend that Sunrise used this software in a manner that resulted in systematic understaffing, thereby preventing employees from taking compliant meal periods.

The evidence submitted by Plaintiffs shows that department managers were required to use the software in scheduling employees, and were encouraged to ensure that the time allotted for each job did not exceed the "target hours" calculated by the system. Dkt. 135, Grant Supp. Decl., Exh. 9 (under seal); Dkt. 132-1, Grant Supp. Decl., Exh. 6, Pham Depo. 93:9-100:2; *id*., Exh. 7, Carlson Depo. 99:14-100:13; *id*., Exh. 3, Cherwin Depo. 23:17-25:21. However, Plaintiffs have not presented any evidence that any missed or late meal breaks resulted from the use of the software. Therefore, Plaintiffs have not shown that the claims of the Meal Period Subclass are linked by a common practice.[6]

*(b) Predominance*

Plaintiffs have not shown that any common issue predominates. The evidence indicates that the software does not create automatic, mandatory staffing levels. Rather, the target hours are based on data about resident care needs. These have been determined by shift coordinators at each Sunrise community based on their assessments of the needs of residents. Pham Depo. 99:1-7. And, although the software generates target hours, shift coordinators have discretion to schedule employees as needed based on the various needs of residents throughout a 24-hour period. Carlson Depo. 100:5-14. For example, one shift coordinator testified that she used the software as a "tool" to help avoid overstaffing, but that she used her discretion to schedule more Care Managers in the mornings and fewer in the afternoons because less care was needed for residents at that time. Pham Depo. 96:8-25; 98:21-99:7. For these reasons, the evidence presented shows that individualized inquiries would be required to determine whether use of the software resulted in understaffing. For example, determinations would have to be made about how each community evaluated the care needs of its residents and how, as a result of such data, each manager exercised his or her discretion to schedule employees.

Furthermore, Defendants have presented evidence that shows a substantial variation as to when and how meal periods were scheduled. Some Sunrise employees schedule their own meal periods, while

6 At the hearing on the Class Certification Motion, Plaintiffs' counsel argued that a common question arose from the discretion Sunrise managers have in scheduling meal breaks. However, Plaintiffs did not cite any evidence that employees were scheduled to take late meal periods or miss meal periods. Rather, the evidence shows only that certain employees missed or took late meal periods. It does not show that they were scheduled to do so. Sunrise is required only to provide a compliant meal period; it was not required to ensure that such a meal period was taken.

others have their meal period times scheduled by a supervisor. *See, e.g.,* Panuco Decl. ¶ 4; DeBernardi-Lieber Decl. 6; Jamar Depo. 148:9-11; Richmond Decl. ¶ 13; Hoang Decl. ¶ 5; Davis Decl. ¶ 4; Hartman Decl. ¶ 6; DeLeon Decl. ¶ 10; Carlson Decl. ¶ 11. Defendants also have `presented evidence that some employees choose to take meal periods at the scheduled times, while others take them later than those times. See, e.g., Hartman Decl. ¶ 6; Carlson Decl. ¶ 12; Longwith Decl. ¶ 9; Manna Decl. ¶ 12. Sunrise also has presented statistical evidence through its expert, Dr. Michael Ward, which shows a wide variation in meal breaks taken depending on job classifications, departments, and Sunrise locations. Ward Decl. ¶¶ 11, 45, Dkt. 91-6. Ward's analysis provides additional support for the view that the differences in missed or short meal breaks among these groups is not due to random chance or the effect of a common practice or policy. *Id*. ¶¶ 11, 62, 64.

For these reasons, Plaintiffs have failed to show that any common question arising from use of the software would predominate in connection with an inquiry into whether employees were denied compliant meal periods. Instead, the question whether and when team members missed or took late or shortened meal periods would require numerous individualized inquiries into the staffing at each Sunrise facility, how meal periods were scheduled, and why meal periods were missed. Therefore, the predominance requirement has not been satisfied. For these reasons, Plaintiffs' Class Certification Motion is DENIED as to the Meal Period Subclass.

(5) Rest Break Subclass

California IWC Wage Order No. 5-2001, subdivision 12(A) provides:

> Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof.

8 Cal. Regs. Code § 11050, subd. 12(A). Under this Wage Order, "[e]mployees are entitled to 10 minutes' rest for shifts from three and one-half to six hours in length, 20 minutes for shifts of more than six hours up to 10 hours, 30 minutes for shifts of more than 10 hours up to 14 hours, and so on." *Brinker*, 53 Cal.4th at 1029.

*(a) Commonality*

From 2009 to November 15, 2012, Sunrise used a "Time Recording Policy Acknowledgment," which employees signed. It provided that employees "are entitled to take a 10-minute rest period for every four (4) hours of work." Grant Decl., Exh. 7. Plaintiffs argue that, under this policy, the second rest period for employees did not accrue until they had worked more than eight hours, and the third rest period did not accrue until they had worked more than 12 hours. If established, this claim would satisfy the commonality requirement. *See In Re: Autozone, Inc., Wage and Hour Employment Practices Litigation*, 289 F.R.D. 526, 533-34 (N.D. Cal. 2012) (certifying rest break claim based on uniform policy that only authorized one rest period for work periods of up to eight hours); *Ordonez*, 2013 WL 210223, at *6 (rest break policy that did not authorize a second break to employees who worked shifts over six hours but less than eight hours satisfied commonality requirement).

Sunrise's California Supplement, a separate document which was provided to all new employees during the class period, states that "Non-exempt team members are provided a paid 10-minute rest break for every four (4) hours of work *or major portion thereof*." Delise Decl. Exh. A-1 at 4 (California Supplement in effect from January 2009 to June 2010) (emphasis added); *id*., Exh. A-2 at 4 (California Supplement in effect from January 2010 to July 2011); *id*., Exh. A-3 at 4 (California Supplement in effect from July 2011 to May 2013); *id*., Exh. A-4 at 4 (California Supplement in effect from May 2013 to the present). These documents and others reflect an effort to comply with California law. *See* Delise Decl., Exh. D. In light of these documents, Plaintiffs have failed to show that there was an official, uniform policy in effect during the class period that violated the wage and hour laws.

Nor have Plaintiffs established the existence of an unwritten common policy or practice that did not conform to those laws. Plaintiffs contend that Sunrise did not schedule second rest periods for shifts of between six and eight hours, and did not schedule third rest periods for shifts of ten to 12 hours, from at least February 25, 2009 until March 14, 2013. Tameifuna Decl. ¶¶ 11-12; Shiferaw Decl. ¶¶ 11-12; Grant Decl., Exh. 9, Tameifuna Depo. at 33:3-10. In support of this position, Plaintiffs cite the analysis performed by one of its counsel, Matthew Matern. His presentation, which was based on rest break logs and assignment sheets, computed the number of rest breaks taken, the number of rest breaks missed, and the number of possible rest breaks. Matern Decl. ¶ 14. From this, Matern concluded that there was a 44.6% "violation rate" for missed meal breaks. *Id.*, Exh. 2. Plaintiffs' statistical expert then multiplied this percentage by the number of shifts in the class period, which resulted in an estimate of 2.5 million rest period violations. Lackritz Decl. ¶ 17. Sunrise has raised several evidentiary objections to the Matern and Lackritz Declarations. For the reasons stated below, these objections are sustained as to the rest break analysis in each declaration.[7]

In addition to these issues, Sunrise has presented evidence that there is substantial variation among employees with respect to whether, when, or for how long any takes a rest break. For example, some employees have scheduled rest break times, while others have discretion to decide when to take their rest breaks. *See, e.g*., Russell Decl. ¶ 6; A. Soto Decl. ¶ 6; Anderson Decl. ¶ 13; Brandon Decl. ¶ 9; Leon Decl. ¶ 6; Spencer Decl. ¶ 7; Zamora Decl. ¶ 5. Furthermore, some employees take more than two

7 Even if this evidence were not excluded, it would not show a common policy or practice of discouraging or prohibiting rest breaks. *First*, the rest break logs and assignment sheets, on which the analysis was based, do not accurately reflect the number of breaks that were actually provided as opposed to those that were recorded. *See, e.g.*, Dkt. 93-1, Gorman Decl., Exh C., Pacheco Depo. 76:3-5 ("Q: So you can't tell from this sheet whether or not you took those breaks? A: No."); *id*., Exh. D, Worku Depo. 110:19-111:23 (same); *id*., Exh. E, Jamar Depo. 259:22-260:7 (same); Dkt. 91-7, Leon Decl. ¶ 12 ("If there is a log that I didn't sign even though I was at work that day, I couldn't say that means I didn't take a rest break that day. It's more likely that I took the break and forgot to sign the log."); *id*., Araya Decl. ¶ 7; *id*., DeLeon Decl. ¶ 9; *id*., Hoang Decl. ¶ 7. *Second*, as noted below, Matern used several assumptions which, if disregarded, would result in a substantial change in the calculated "violation rate," *i.e.,* from 44.6% to 27.77%. *Compare* Matern Decl. ¶ 14, *with* Matern Decl. II, Exh. M *and* Dkt. 117 at 19. *Third*, Sunrise has identified a number of errors in the analysis performed by Matern and his associates. For example, certain rest break logs and assignment sheets were counted twice, while others appear to have been skipped. Dkt. 93 at 23-24. And, as noted below, Matern improperly weighted the sample. As a result of these deficiencies, even if the Matern Declaration were admitted, it would not support certification of either the Rest Break or Rest Break Coverage Subclasses.

10-minute rest breaks during shifts longer than six hours. *See* Buts Decl. ¶ 10; Bohannon Decl. ¶ 14; Vashchenko Decl. ¶ 16; Hartman Decl. ¶ 5. Others choose not to take two formal, 10-minute rest breaks notwithstanding that they are provided the opportunity to do so. Ackley Decl. ¶ 8; Reed Decl. ¶ 9; Nunes Decl. ¶ 7; Morris Decl. ¶ 6. The expert engaged by Sunrise has submitted evidence that supports the conclusion that any missed rest breaks are not linked by a common policy. As with meal periods, his analysis shows a wide variation among Sunrise locations as to when and whether rest breaks were taken. Ward Decl. ¶ 77, Dkt. 91-6. Ward's analysis also shows that the differences in missed or short meal breaks among these communities is not due to random chance or the effect of a common practice or policy. *Id*. ¶ 78.

There is insufficient evidence of a common policy of practice depriving employees of mandated rest breaks. There is evidence of variations among employees with respect to whether and when rest breaks are taken. For these reasons, commonality cannot be shown as to this claim.

*(b) Predominance*

Because Plaintiffs have failed to show that the commonality requirement is met, individual issues will necessarily predominate in connection with the resolution of the claims of the Rest Break Subclass.[8] Moreover, Sunrise employees do not clock in or out for their rest breaks. This makes it difficult to determine whether any employee missed a rest break without conducting highly individualized inquiries. *Purnell*, SA CV10-00897 JAK (MLGx), Dkt. 89 at 6-8. Although Plaintiffs have submitted rest break logs that document rest breaks taken in certain Sunrise communities, Sunrise has presented evidence that these logs are not uniformly or consistently used. *See, e.g.*, Leon Decl. ¶ 12 (Wellness Department used rest break logs); Amaya Decl. ¶ 8 (does not record rest breaks); Richmond Decl. ¶ 20 (never recorded break times when worked as Medication Manager); Spencer Decl. ¶ 8, Exh. B ("I'm sure that I still took my rest breaks that day but just forgot to sign the log."); A. Soto Decl. ¶ 7 (regularly forgot to record rest breaks).

For these independent reasons, the Class Certification Motion is DENIED as to this Subclass.

(6) On-Call Subclass

To comply with its obligation to provide meal periods, Sunrise was required to "relieve[] its employees of all duty, relinquish[] control over their activities and permit[] them a reasonable opportunity to take an uninterrupted 30-minute break." *Brinker*, 53 Cal. 4th at 1040. Plaintiffs contend that rest breaks must be ten consecutive, "duty free" minutes. *See* DLSE Op. Ltr. (Re: Rest Period Requirements), Feb. 2, 2002. Thus, "an employer need only relieve an employee of duty rather than ensure that the employee does not

8 At the hearing on the Class Certification Motion, Plaintiffs' counsel argued that Sunrise could not defeat predominance through individual declarations where there was proof of a uniform policy that violated the applicable law, and cited *Autozone*, 289 F.R.D. at 533-34. However, the "Time Recording Policy Acknowledgment" proffered by Plaintiffs is contradicted by the statements in the employee handbooks in use during the same time period. They set forth procedures that comply with California law. Therefore, Plaintiffs have not shown that Sunrise had a uniform policy that was in violation of law with regard to rest breaks. In this context, reliance on the "Time Recording Policy Acknowledgment" to "the near exclusion of other relevant factors touching on predominance" is not warranted. Abdullah v. U.S. Sec. Associates, Inc., 731 F.3d 952, 95 (2013).

work" to comply with the meal or rest break requirements. *Campbell v. Best Buy, LLP*, 2013 U.S. Dist. LEXIS 137792, at *30-31 (C.D. Cal. 2013) (citing *Brinke*r, 53 Cal. 4th at 1034; *Nguyen v. Baxter Healthcare Corp.*, 2011 WL 6018284 at *5 (C.D. Cal. 2011); *Washington v. Joe's Crab Shack*, 271 F.R.D. 629, 641 (N.D. Cal. 2010)).

Here, Plaintiffs claim that the uniform policies of Sunrise did not relieve employees of all duties during their meal and rest periods. For example, they claim that Sunrise required Care Managers to carry pagers, scout phones, or radios during their shifts (Grant Decl., Exh. 6, Delise Depo. at 56:9-57:2; *id*., Exh. 1, Polgar Depo. 184:8-24, 193:8-16). They were also required to respond to emergency calls for resident care (Polgar Depo., 188:2-13). And, they were required to take their meal and rest breaks only at the scheduled times set by their supervisors (*id.* 4:13-15, 96:16-97:10; *id.*, Exh. 8).

None of these policies, on its face, violates California's rest break law. And, certain of the official policies of Sunrise direct that employees are to be "relieved of all duties during the meal period," including responding to "scout phones, pagers, etc." Delise Decl., Exh. B,C; *Id*., Exh. A-1 ("Non-exempt team members who work five (5) or more hours in a workday must take a 30-minute uninterrupted meal period."). Other official policies of Sunrise state that "if a team member is 10 minutes into their meal period and is called to help with a resident, the team member did not receive a full, uninterrupted 30-minute meal period. That team member must be paid for the 30 minutes and be provided a new, uninterrupted 30-minute meal period." *Id*., Exh. A-1 at 3. Similarly, it provides that "[t]eam members who are called away from a rest break are entitled to a new, uninterrupted 10-minute rest break." *Id.* at 4. Thus, on their face, the Sunrise policies comply with California law.

Plaintiff next contends that, collectively, these policies result in rest break violations. Thus, if a resident makes an emergency call just prior to when a Care Manager is scheduled to take his or her meal or rest break, the employee is required to respond and work through, or into, his or her break. *See Schulz v. QualServ*, No. 09-CV-17-AJJB, 2012 U.S. Dist. LEXIS 58561, at *23 (S.D. Cal. Apr. 2, 2012) (certifying meal and rest break claims based on Defendants' common corporate policy of failing to relieve technicians of all work during the rest and meal periods."). In essence, Plaintiff contends that there is a de facto "policy-to-violate-the-policy" that meal and rest breaks should be uninterrupted. *See Mahoney v. Farmers Ins. Exch*., No. 4:09-cv-2327, 2011 WL 44558513, at *9 (S.D. Tex. Sept. 23, 2011).

Based on the evidence presented, there is not a sufficient showing that the claims of the On-Call Subclass are predicated on a common claim that is susceptible of classwide determination. This conclusion follows for two principal reasons. *First*, Plaintiffs have not demonstrated a systematic policy that required employees to respond to emergency calls while on their breaks. Rather, there is substantial evidence that the practice among employees varied with respect to whether they brought their mobile devices with them during breaks. *See* Davis Decl. ¶ 7; Araya Decl. ¶ 10; Dove Decl. ¶ 12; Vashchenko Decl. ¶ 9; Alvarado Decl. ¶ 11; Johnston Decl. ¶ 8; Longwith Decl. ¶ 15.

*Second*, Plaintiffs have not demonstrated that there is a systematic policy that required employees to miss rest breaks to respond to resident calls. As discussed above, there is variation among communities and departments as to whether breaks are pre-scheduled. And, receipt of a resident call just prior to a scheduled break does not always result in a missed rest break. Rather, there are various ways employees and Sunrise communities respond to such a call. Another employee may respond to the call

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

| | | | |
|---|---|---|---|
| Case No. | LA CV13-02171 JAK (PLAx) | Date | June 11, 2014 |
| Title | Betelhem Shiferaw v. Sunrise Senior Living Management, Inc., et al. | | |

(Alvarado Decl. ¶ 10; Carlson Decl. ¶ 10; Watkins Decl. ¶ 8) or the employee might respond to the call and then take his or her break. Pacheco Depo. 122:17-23; Worku Depo. 168:14-169:8; Jamar Depo. 173:15-23; Vashchenko Decl. ¶ 11.[9]

Plaintiffs have not met their burden of demonstrating that there was a uniform practice that required employees to miss scheduled rest breaks as a result of the emergency response policies. Therefore, there is no common contention to bind the members of this proposed class. Instead, individual questions as to whether and when rest breaks were missed as a result of emergency calls, whether certain employees could not obtain coverage by another person to respond to an emergency call placed just prior to a scheduled break, or whether employees were able to take rest breaks later than scheduled but still within the legally mandated time period, will predominate over any common questions. For these reasons, the Class Certification Motion is DENIED as to this Subclass.

(7) Off-the-Clock Subclass

California law requires an employer to pay for all "hours worked" by an employee. *Morillion v. Royal Packing Co*., 22 Cal. 4th 575, 582 (2000). Employees are deemed to be working when they are "subject to the control of an employer." *Id.* at 584. A claim for off-the-clock work is "contingent on proof [that the employer] knew or should have known off-the-clock work was occurring." *Brinker*, 53 Cal. 4th at 1051-52.

*(a) Commonality*

Sunrise's official policy complies with California law. It states that employees are not allowed to work "'off-the-clock' under any circumstances." Grant Decl., Exh. 7. However, Plaintiffs argue that there is substantial evidence that, notwithstanding this formal rule, Sunrise had a "systematic company policy" of requiring or pressuring Care Managers to work off-the-clock. Specifically, Plaintiffs contend that Care Managers were required to attend "cross-over meetings" before or after their shifts. At these meetings, which occurred "at shift change," employees "share[d] relevant information about the residents in order to ensure quality of care." Grant Decl., Exh. 14.[10] However, Plaintiffs argue that employees were required to "clock out" at the end of their shifts even if the meeting had not concluded. Grant Decl., Exh. 7 ("Each day the team member will clock in at the start of their shift and clock out at the end of the shift."). Furthermore, Plaintiffs contend that Sunrise discouraged overtime by requiring advance approval. Delise Decl., Exh. A-1 at 4 ("Typically, overtime should only be incurred at the request of and with approval by the team member's supervisor."); Grant Decl., Exh. 7 ("Working unapproved overtime may result in disciplinary

9 Sunrise has also presented evidence that there was no uniform policy requiring all employees to carry a communications device. Rather, some employees did not carry mobile devices on their shifts. *See* Cox Decl., Exh. P, Sanders Depo. 131:18-21; DeLeon Decl. ¶ 7; Soto Decl. ¶ 9; Hoang Decl. ¶ 11; Lewis Decl. ¶ 9. Other team members carry only walkie-talkies, which are not connected to the resident emergency call system. Pacheco Depo. 109:19-110:4; Hartman Decl. ¶ 8; Galdamez Decl. ¶ 7. Others carry pagers that receive calls from pull cords operated by resident. Washington Decl. ¶ 10; Dkt. 78-8, Exh. 20, Watson Decl. ¶ 5. However, the proposed class definition extends only to Care Managers who are required to carry such devices. Therefore, variation among non-class members is not pertinent to the inquiry on commonality.
10 Plaintiffs contend that some of these meetings lasted up to an hour. They have not presented evidence to substantiate that claim.

action.”). Plaintiffs argue that, collectively, these policies resulted in a requirement that Care Managers work off-the-clock.

The evidence submitted by Plaintiffs and Sunrise shows that Sunrise had a uniform policy requiring Lead Care Managers and, on certain occasions, Care Managers, to participate in cross-over meetings. Dkt. 132-1, Supp. Grant Decl., Exh. 11 (cross-over meeting policy and forms); Dkt. 110, Grant Decl., Exh. 14; Pacheco Depo. 67:1-68:10; Davis Decl. 3; Carreon Decl. ¶ 16; Pham Decl. ¶ 6; Lee Decl. ¶ 15; Richmond Decl. ¶ 26; Reed Decl. ¶ 10. Plaintiffs have also demonstrated that Sunrise had policies requiring employees to clock out at the end of their shifts. Grant Decl., Exh. 7. Pursuant to these policies, a common issue binds the members of this subclass: Whether mandatory participation in cross-over meetings resulted in nonpayment for time worked.

The competing arguments and evidence presented by Sunrise with respect to this subclass primarily address the merits of the claims. Thus, Sunrise contends that, in general, only the Lead Care Manager participated in cross-over meetings. Grant Decl., Exh. 14; Pacheco Depo. 67:1-68:10; Davis Decl. 3; Carreon Decl. ¶ 16; Pham Decl. ¶ 6. Furthermore, Sunrise contends that most cross-over meetings take only 10 to 15 minutes (Grant Decl., Exh. 14), and that Lead Care Managers are scheduled to work shifts that overlap with at least one adjacent shift. *See* Carlson Decl. ¶ 7; Aquino Decl. ¶ 11; Martin Decl. ¶ 15.

The evidence presented suggests that some of the cross-over meetings did not require off-the-clock work. The analysis of Sunrise’s expert corroborates this position. He considered the shifts worked by Lead Care Managers and found that, as to 87.2% of them, the overlap between the departing Lead Care Manager and replacing Lead Care Manager was 15 minutes or more. Ward Decl. ¶ 83. However, this evidence goes to the merits of these claims and not to whether a class should be certified.[11] *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013) (Rule 23 requires only “a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class.”).

From this evidence, Sunrise contends that it did not have a policy requiring off-the-clock work. However, Plaintiffs do not contend that Sunrise had such a policy. Rather, Plaintiffs contend that Sunrise had a uniform policy requiring certain employees to participate in cross-over meetings, which resulted in required, off-the-clock work. The existence of this policy links the members of the subclass members through a common factual claim. Therefore, the commonality requirement has been shown as to this Subclass.

*(b) Predominance*

Sunrise has presented certain evidence suggesting that individual inquiries will be required to determine whether the cross-over meeting requirement resulted in off-the-clock work. *First*, although it is clear that

11 Plaintiffs contend that Sunrise distorts Ward’s analysis. Thus, the 87.2% figure includes shifts in which the Lead Care Managers were working together. Under these circumstances, they would not have participated in the same cross-over meetings. Dkt. 132 at 12 (citing Ward Depo. 124:19-126:9; Ward Decl., Exh. 4, Table 5.1). By contrast, only 27.9% of the shifts in Table 5.1 had an overlap of 10-29 minutes, and 53.6% had an overlap of 10-59 minutes. Ward Decl., Exh. 4, Table 5.1. This could support a finding that only some Lead Care Managers who were required to participate in cross-over meetings were scheduled to overlap at a shift change with another Lead Care Manager.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

| Case No. | LA CV13-02171 JAK (PLAx) | Date | June 11, 2014 |
| --- | --- | --- | --- |
| Title | Betelhem Shiferaw v. Sunrise Senior Living Management, Inc., et al. | | |

Lead Care Managers were required to participate in cross-over meetings (Grant Decl., Exh. 14; Pacheco Depo. 67:1-68:10; Davis Decl. 3; Carreon Decl. ¶ 16; Pham Decl. ¶ 6), Sunrise has submitted evidence that Care Managers were asked to participate on certain occasions. *See* Lee Decl. ¶ 15; Richmond Decl. ¶ 26; Reed Decl. ¶ 10. Therefore, Sunrise argues that individualized inquiries may be required to determine whether and when Care Managers were required to participate in cross-over meetings. It also argues that the same will be true as to whether such Care Managers were already scheduled to overlap with the incoming shift such that participation in the cross-over meeting would not have resulted in nonpayment for time worked. [12]

*Second*, although Plaintiffs have presented some evidence suggesting that Sunrise had policies with respect to scheduling shifts of Lead Care Managers and Care Managers (Supp. Grant Decl., Exh. 9 (Sunrise's Staffing Model); *id*., Exh. 10 (schedules)), Ward's analysis of the Off-the-Clock Subclass shows a substantial variation across communities regarding how much overlap occurred between outgoing and replacing Lead Care Managers. Ward Decl. ¶ 84. Therefore, individual inquiries may be required with respect to whether scheduling practices varied across communities.

*Third*, Sunrise argues that time worked off-the-clock would not be reflected in the time records. Therefore it argues that it would not be possible to determine whether any putative class member worked off-the-clock without engaging in numerous individualized inquiries.

*Finally*, notwithstanding the policy of Sunrise to discourage unapproved overtime, it was its official policy to compensate employees for overtime worked. Grant Decl., Exh. 7. Thus, individualized inquiries may be required to determine whether the cross-over policy resulted in nonpayment for time worked.

Based on this evidence, certain individualized inquiries would be required as to the claims of this subclass. It would be necessary to determine which Care Managers were required to participate in cross-over meetings in order to ascertain the class. And, once the class was ascertained, it would be necessary to determine whether the cross-over meetings occurred while all participants were on shift, clocked in, or otherwise being paid. And, because Sunrise contends that time records do not reflect the time worked while employees are not clocked in, individual inquiries would be required to make these determinations.

For these reasons, Plaintiffs have not met their burden of showing that the predominance requirement is met. Thus, although a common question exists as to this subclass, the Class Certification Motion is DENIED as to the Off-the-Clock Subclass.

(8) Rest Break Coverage Subclass

12 Sunrise has also presented evidence that some employees are not required to participate in crossover meetings. Christianson Decl. ¶ 9 (business office coordinator); Fabian Decl. ¶ 11 (lead server); Lewis Decl. ¶ 4 (life enrichment manager); Landers Decl. ¶ 12 (care manager); Copas Decl. ¶ 9 (maintenance coordinator). However, the proposed class definition extends only to Care Managers who are required to participate in such meetings. Therefore, variation between subclass and non-subclass members is not pertinent to the predominance inquiry.

Plaintiffs contend that Sunrise failed to provide rest periods because it did not adequately staff its properties. Thus, they claim that Sunrise employed a policy of staffing to ensure that "residents' needs based on acuity" were met and that this priority meant that it did not ensure that there would be sufficient staff so that employees could take rest breaks. Grant Decl., Exh. 1, Polgar Depo at 104:14-106:3; *id.*, Exh. 5, Cherwin Depo. at 29:16-30; *id.*, Exh. 17. As a result of this policy, Plaintiffs contend that employees were regularly forced to miss their scheduled rest breaks.

The staffing practices of Sunrise were discussed above in connection with the Meal Period Subclass. These practices do not, on their face, violate California law. Rather, they demonstrate the likelihood that individualized inquiries will predominate in determining whether and when staffing shortages caused employees to miss their rest breaks. This is confirmed by Kathleen Cherwin's deposition testimony that Sunrise "do[es] not have corporate staffing policies" but, rather, each community makes staffing decisions based on resident need. Cox Decl., Exh. F, Cherwin Depo. 22:1-20, 22:16-30:16. And, although Plaintiffs have presented evidence that certain putative class members believed that they could not take rest breaks because there were not enough employees on duty to attend to the needs of Sunrise residents (Adcock Decl. ¶ 11; Jamar Decl. ¶¶ 7-8; Mendez Decl. ¶ 6), other evidence shows that there was a significant variation regarding covering of duties while employees were on their breaks. For example, some employees do not require coverage during breaks because of the nature of their duties. Lewis Decl. ¶ 7; Hartman Decl. ¶ 7; Buts Decl. ¶ 12. Certain employees had their duties covered by team members designated for coverage duty, while others coordinated with other employees who were on the same shift to ensure that all duties were covered. *See* Aquino Decl. ¶ 6; K. Soto Decl. ¶ 16; Manna Decl. ¶ 15; Buts Decl. ¶ 12; Kahn Decl. ¶ 10; Alvarado Decl. ¶ 11; Lee Decl. ¶ 11.

In light of the evidence presented, the litigation of Plaintiffs' rest break coverage theory will depend on individualized questions. These would include how each facility and department was staffed, whether and how departments arranged for the coverage of duties of employees who were on breaks, and whether any missed breaks were a result of these varied staffing practices. For these reasons, Plaintiffs have not met the requirements of commonality and predominance. Therefore, the Class Certification Motion is DENIED as to the Rest Break Coverage Subclass.

e) Superiority of Class Action

Individual inquiries will predominate over common questions for the following: (i) Rounding Subclass; (ii) Meal Period Subclass; (iii) Rest Break Subclass; (iv) On-Call Subclass; (v) Off-the-Clock Subclass; and (vi) Rest Break Coverage Subclass. Thus, a class action is not a superior method for adjudicating these claims. Classwide adjudication would require the presentation of evidence as to the staffing in various facilities, and how the various legally-compliant, official policies of Sunrise regarding meal and rest periods were interpreted by different employees.

In contrast, a class action is superior to individual actions as to whether employees were paid overtime using the "regular rate of pay" as required by California law and whether the rounding policy as applied to meal periods resulted in nonpayment for time worked. These claims will involve common evidence regarding Sunrise's calculation of the regular rate of pay and statistical evidence regarding whether the rounding policy was neutral. And, as discussed above, these common questions would not be superseded by individual questions as to these subclasses.

* * *

For the reasons stated, the Class Certification Motion is GRANTED IN PART. Specifically, it is granted with respect to the Regular Rate Subclass, and claims for nonpayment for time worked for Meal Period Subclasses A and B. It is denied for the meal period premium claims for Meal Period Subclass A and the remaining six subclasses.

### B. Matern Motion

As discussed above, in support of Plaintiffs' Class Certification Motion, Plaintiffs' Counsel, Matthew Matern ("Matern"), submitted a declaration in which he addresses alleged rest break violations at Sunrise. In his declaration, Matern concludes that the proposed Rest Break Subclass missed 44.6% of their 10-minute rest breaks. Dkt. 78-3, Matern Decl. ¶ 14. In reaching this conclusion, Matern used the following process. First, associates in his office selected[13] two of the 60 banker's boxes of documents containing rest break logs and daily assignment sheets that were made available to them by Sunrise. *Id.* ¶¶ 3-4; Dkt. 93-1, Gorman Decl. ¶ 16. This sample represented 30 Sunrise communities. Matern Decl. ¶ 5. Second, the associates entered the Bates numbers for the rest break logs and assignment sheets from the two boxes into a Microsoft Excel spreadsheet. They then used the "RAND" function in Excel to generate a random list of 50 pages per community. *Id.* ¶ 10. Finally, they analyzed this sample of rest break logs and assignment sheets to determine how many rest breaks were "missed," using certain interpretive criteria and assumptions they had developed. *Id.* ¶¶ 8-14. The associates then divided the total number of missed rest breaks by the total number of possible rest breaks. *Id.* ¶ 14.

After the Matern Declaration was filed, Plaintiffs served Sunrise with a "revised" rest break log analysis. This revised analysis shows a decrease of around 1,500 missed rest breaks. This resulted in reducing the previously calculated violation rate of 44.6%, to a 34.71% rate. Gorman Decl., Exh. M; Dkt. 117-1, Matern Decl. II, Exh. M.

Sunrise contends that the Matern Declaration should be excluded for three reasons: (i) as a sanction under Fed. R. Civ. P. 37 for Matern's failure to appear at his deposition; (ii) because it is inadmissible expert testimony under Fed. R. Evid. 702; and (iii) because it is inadmissible under Fed. R. Evid. 602 and 701. Dkt. 93 at 11-12.

1. <u>Failure to Appear at Deposition</u>

After Matern filed his Declaration in support of the Class Certification Motion, Sunrise served him with a subpoena and notice to appear for a March 17, 2014 deposition. Gorman Decl., Exh. G.[14] Plaintiffs responded with a letter stating that Matern had not been properly served with the subpoena and claiming

13 Plaintiffs do not explain the method by which this selection was made.

14 Plaintiffs contend that the subpoena was not properly served. Dkt. 117 at 6-10. Thus, it was delivered to Cathy Lozano, a legal assistant at Matern Law Group who is not designated to accept service of process on behalf of Matern. Dkt. 117-1, Matern Decl. II ¶ 3. Furthermore, Sunrise failed to tender witness fees and mileage costs at the time of service. Matern Decl. II ¶ 4. Plaintiffs contend that, as result, the subpoena did not comply with Fed. R. Civ. P. 45(b)(1).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV13-02171 JAK (PLAx) | Date | June 11, 2014 |
| Title | Betelhem Shiferaw v. Sunrise Senior Living Management, Inc., et al. | | |

that the attorney-client privilege applied to the testimony that would be sought from Matern. Dkt. 93-1, Gorman Decl., Exh. I. However, Plaintiffs offered to respond to 15 interrogatories in lieu of the deposition. *Id.* Sunrise rejected that proposal. Matern did not appear for his deposition. Gorman Decl., Exh. J, L, N.

Sunrise contends that exclusion of the Matern declaration is an appropriate sanction for his failure to appear at his deposition. Plaintiffs contend that Matern was not required to attend and testify at a deposition because this would have resulted in the discovery of information protected by attorney-client privilege. Dkt. 117 at 10-11.

The Ninth Circuit has not yet established the appropriate standard for a determining whether an attorney may be deposed. However, other Circuits have held that the assertion of a claim of attorney-client privilege does not provide an absolute shield for an attorney whose deposition has been noticed. *See In re Subpoena Issued to Dennis Friedman,* 350 F.3d 65, 71–72 (2d Cir.2003); *Shelton v. Am. Motors Corp.*, 805 F.2d 1323 (8th Cir. 1986). District courts within California have applied both of these decisions. The Second Circuit has held that courts should consider various factors in determining whether the deposition of an attorney should take place, including:

> the need to depose the lawyer, the lawyer's role in connection with the matter on which discovery is sought and in relation to the pending litigation, the risk of encountering privilege and work-product issues, and the extent of discovery already conducted....

*In re Subpoena Issued to Dennis Friedman*, 350 F.3d at 72. “Under this approach, the fact that the proposed deponent is a lawyer does not automatically insulate him or her from a deposition nor automatically require prior resort to alternative discovery devices, but it is a circumstance to be considered.” *Id.* By contrast, the Eighth Circuit discourages deposing opposing counsel. In *Shelton v. Am. Motors Corp.*, 805 F.2d 1323 (8th Cir. 1986), the Eight Circuit held that a party may only depose opposing counsel “where the party seeking to take the deposition has shown that (1) no other means exist to obtain the information than to depose opposing counsel, *. . .* (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case.” *Id.* at 1327.

In this action, Plaintiff’s counsel elected to insert himself into the case as a witness. He did work that an expert witness could have performed; he then presented a declaration that was based on the work that he performed and oversaw. Had the work been done by an expert, a deposition clearly would have been appropriate. Under these circumstances, it is logical to apply the rationale of the Second Circuit. Under its standard, Sunrise was entitled to depose Matern. First, Sunrise has shown a need to depose Matern, because his declaration is the basis for the calculation of the rest break violation rate upon which Plaintiffs rely to seek to establish the Rest Break Subclass. As such, it also bears on the validity of the opinion of Plaintiffs’ statistical expert, Dr. Lackritz, who relied on this figure to conduct his own analysis of the Rest Break Subclass. Furthermore, the information for which discovery is sought is not privileged. Rather, Matern’s analysis was created from rest break logs provided by Sunrise. Finally, had Matern appeared, specific objections could have been made, and answers potentially withheld, to particular questions where a claim of privilege was made. Any resulting disputes could have been addressed through a motion to compel. By his failure to appear, Matern foreclosed this normal process.

Sunrise has not shown, however, that exclusion of the Matern Declaration is an appropriate sanction for his failure to appear at his deposition. Sunrise first cites Fed. R. Civ. P. 37(b)(2), which authorizes sanctions when a party or a party's designated witness fails to obey an order to provide discovery. However, that rule does not apply because Sunrise did not move to compel Matern's deposition. Therefore, there was no order that he appear. Sunrise next cites Fed. R. Civ. P. 37(d), which authorizes the Court, on motion, to order sanctions if "a party or a party's officer, director, or managing agent—or a person designated under Rule 30(b)(6) or 31(a)(4)—fails, after being served with proper notice, to appear for that person's deposition." Matern is neither a party to this matter nor a Rule 30(b)(6) designee.

Fed. R. Civ. P. 37 does not clearly contemplate the imposition of sanctions under these facts. Moreover, Plaintiffs have raised concerns regarding whether the subpoena was served in compliance with Fed. R. Civ. P. 45. First, the subpoena was delivered to Cathy Lozano, a legal assistant at Matern Law Group who was not authorized to accept service for Matern. Lozano Decl. ¶ 3. Several courts have interpreted Fed. R. Civ. P. 45 to require personal service. *See FTC v. Compagnie De Sain-Gobain-Pont-a-Mousson*, 636 F.2d 1300, 1312 (D.C. Cir. 1980); *Alexander v. California Dept. of Corrections*, 2011 WL 1047647, at *8 (E.D. Cal. March 18, 2011). Second, Defendants did not tender witness fees and mileage at the time of service. *See* Fed. R. Civ. P. 45(b)(1); *CF&I Steel Corp. v. Mitsui & Co.*, 713 F.2d 494, 496 (9th Cir. 1983) ("[T]he plain meaning of Rule 45(b)(1) requires simultaneous tendering of witness fees and the reasonably estimated mileage allowed by law with service of a subpoena."). In light of these deficiencies, exclusion of the Matern Declaration as a sanction for his failure to appear at his scheduled deposition is not appropriate.

2. <u>Expert Opinion</u>

Sunrise contends that Matern's declaration is being offered as expert testimony because it purports to establish a common method of proof for determining missed rest breaks across the class. *Smith v. Ceva Logistics U.S., Inc*., 2011 WL 320482 (comparing time records to determine missed meal breaks constitutes expert testimony under Rule 702); *York*, 2011 WL 8199987, at *15 (declaration of plaintiff's counsel was "plainly offered as an expert opinion in support of the motion to certify" where it offered statistical evidence to prove that errors made by plaintiff's expert were inconsequential). Sunrise then provides a variety of reasons why Matern's analysis is unreliable, based on flawed assumptions, and should be excluded under Fed. R. Evid. 702. Dkt. 93 at 17-28.

Matern does not purport to be qualified as an expert witness. Dkt. 117 at 11-13. Thus, his declaration is not admissible as an expert opinion. The relevant inquiry is whether his testimony is admissible under Fed. R. Evid. 602 and 701.

3. <u>Personal Knowledge and Opinion Testimony</u>

Under Fed. R. Evid. 602, a nonexpert witness "may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Sunrise contends that Matern does not have personal knowledge of the analysis of the rest break violations because he did not participate in the analysis. Instead, others at his firm gathered and analyzed the documents. Dkt. 93 at 29. This argument is unpersuasive. Matern supervised the analysis and reviewed the underlying

documents. Dkt. 117 at 25-27.[15] Sunrise next argues that Matern lacks personal knowledge of the underlying rest break practices. This argument has some force. In creating his rest break analysis, Matern and his associates were required to interpret the rest break logs provided by Sunrise. As he acknowledges, they made a number of assumptions in performing this analysis because Plaintiffs' counsel did not have personal knowledge about how the rest break logs were used and completed at various Sunrise communities. Matern's lack of personal knowledge as to the rest break practices influenced the outcome of the rest break analysis.

Further, Matern's declaration is inadmissible under Fed. R. Evid. 701. Under that rule, "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is . . . rationally based on the witness's perception [and] not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." *Id*. Matern's rest break analysis was not based on his own perception. Instead it was premised on specialized knowledge regarding the rest break practices of Sunrise and/or on a statistical analysis. Dkt. 93-1, Gorman Decl., Exh. A, Lackritz Depo. 191:7-23 (Plaintiffs' statistical expert, noting that, in order to interpret the rest break logs, he would need "some initial training as to how to read those log sheets and how to interpret some of the assumptions that were made in determining whether or not rest breaks were taken as well as maybe some HR skills."). Indeed, as Sunrise points out, Plaintiffs' counsel repeatedly objected to questions in depositions regarding whether a rest break log reflects a missed rest break as "[calling] for an expert opinion." *Id*., Exh. B, Sanders Dep. 168:25-169:6 (Plaintiffs' counsel objecting to question asking witness to interpret his own rest break log); *id*., Exh. A, Lackritz Depo. 226:11-228:13 (objections to interpreting rest break logs as calling for expert testimony).

Plaintiffs respond that the rest break analysis did not require any scientific, technical, or other specialized knowledge. Rather, it was conducted by counting the number of possible rest breaks and dividing that figure by the number of missed breaks. As such, Plaintiffs contend, it amounts to no more than "basic arithmetic." Dkt. 117 at 12.[16] This argument is unpersuasive. The rest break analysis called for expert determinations regarding how the rest break logs should be interpreted and how to calculate the percentage of alleged missed rest breaks.

As noted above, in conducting their rest break log analysis, Matern and his associates created and relied

---

15 Plaintiffs also filed the supplemental declarations of the associates who conducted the rest break analysis. *See* Dkt. 117-2, Wand Decl. II; Dkt. 117-3, Ganschow Decl.

16 Plaintiffs also contend that the Court need not address the ultimate admissibility of the Matern declaration at the class certification stage. Dkt. 117 at 23 (citing *Aburto v. Verizon California, Inc.*, CV 11-03683-ODW VBKX, 2012 WL 10381 n.1 (C.D. Cal. Jan. 3, 2012); *Alonzo v. Maximus, Inc.*, 275 F.R.D. 513, 519 (C.D. Cal. 2011); *Dominguez v. Schwarzenegger*, 270 F.R.D. 477, 483 (N.D. Cal. 2010)). However, these decisions relied on the Ninth Circuit's opinion in *Dukes v. Wal–Mart Stores, Inc.,* 603 F.3d 571, 591 (9th Cir.2010), which was reversed by the Supreme Court. 131 S. Ct. at 2551. In that opinion, the Supreme Court noted in dicta that the *Daubert* analysis likely applies at the class certification stage, thereby implying that a district court should assess the admissibility of the evidence at this phase. Further, in *Schwarzenegger*, the court concluded that admissibility of evidence need not be determined because at the class certification stage, "the district court is bound to take the substantive allegations of the complaint as true." 270 F.R.D. at 483. However, in *Wal-Mart*, the Supreme Court held that "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart,* 131 S. Ct. at 2551.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

| Case No. | LA CV13-02171 JAK (PLAx) | Date | June 11, 2014 |
|---|---|---|---|
| Title | Betelhem Shiferaw v. Sunrise Senior Living Management, Inc., et al. | | |

on a number of assumptions to determine when the rest break logs and assignment sheets reflected missed rest breaks. *See* Matern Decl. ¶ 12. For example, Matern assumed that "if no shift length was denoted [on the rest break log], that shift was 6 hours or longer." *Id*. By contrast, Plaintiffs' expert determined that approximately 80% of shifts are 6 hours or longer. Dkt. 78-6, Lackritz Decl. ¶ 11. Matern also assumed that if a "?" or a 30-minute meal break was denoted in the rest break column, a rest break was missed. If these assumptions are incorrect, there would be a material change in the rest break violation rate. Thus, it would drop from 44.6% to 27.77%. *See* Matern Decl. II, Exh. M; Dkt. 117 at 19. This variation demonstrates the lack of reliability of the purported lay opinion in the Matern Declaration. Without specialized expertise or an evidentiary basis for making these assumptions, Matern was not qualified to devise or present them.

Furthermore, Matern gave improper weight to the sample. He divided the total alleged missed rest breaks by the total alleged possible breaks across 30 different Sunrise communities. However, he failed to account for the fact that some communities have more possible breaks than others. In light of this, some data should be weighted differently to make the analysis statistically valid. *See* Dkt. 93 at 25-26. For example, Matern determined that one community in Fullerton had 1,498 possible breaks. Matern Decl., Exh. 2. Another in Huntington Beach had only 56 possible rest breaks. *Id.* However, the difference between these two communities was not accounted for in determining the total "violation rate." Thus, Fullerton is given 30 times the weight of Huntington Beach in the analysis.

These flaws in Matern's methodology demonstrate why such work is to be undertaken by a person with specialized knowledge. *See* Dkt. 131-1, Gorman Decl., Exh. B, Ward Depo. 210:13-211:21 (testifying that in order to conduct an accurate analysis based on a random sampling of several boxes of documents, one would need to "re-weight" the sample and "check statistically whether the sample of results . . . [was] representative of the population"). Other courts have rejected similar analyses offered as a common method of proof of rest and meal period violations. *See Smith v. Ceva Logistics U.S., Inc.*, CV 09-4957 CAS RCX, 2011 WL 3204682 (C.D. Cal. July 25, 2011) (comparison of time records with time-stamped transaction records to establish meal period violations required specialized knowledge); *York v. Starbucks Corp.*, CV 08-07919 GAF PJWX, 2011 WL 8199987 (C.D. Cal. Nov. 23, 2011) (statistical evidence offered by counsel to prove expert's errors were insignificant excluded as improper expert opinion).

For these reasons, the rest break analysis provided by Matern is not admissible as lay opinion. Therefore, the Matern Motion is GRANTED IN PART. Paragraphs 3 through 17 are stricken as improper lay opinion testimony. However paragraphs 1, 2 and 17 through 23 of the Declaration are not stricken, because they are a summary of Matern's experience, education, and description of the Matern Law Group. As such, these paragraphs are relevant to Plaintiffs' adequacy contentions and irrelevant to the rest break analysis. Therefore, the arguments made by Sunrise are inapplicable to these paragraphs.

### C. Lackritz Motion

#### 1. Legal Standard

A witness who is qualified as an expert may provide evidence through an opinion if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. District courts perform a "gatekeeping" function in determining the admissibility of expert testimony. *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 597 (1993). It may be applied at the class certification stage. *See Wal-Mart*, 131 S.Ct. at 2553–54 ("The District Court concluded that *Daubert* did not apply to expert testimony at the certification stage of class-action proceedings. We doubt that is so....") (citation omitted); *York v. Starbucks Corp.*, CV 08-07919 GAF PJWX, 2011 WL 8199987 (C.D. Cal. Nov. 23, 2011) (determining the admissibility of expert declarations at the class certification stage). However, a "trial court has broad latitude not only in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011).[17]

2. <u>Application</u>

Plaintiffs retained Dr. James Lackritz to review and analyze a sampling of time and payroll records in connection with the Class Certification Motion. Lackritz Decl. ¶ 2. Lackritz has a Ph.D. in Statistics and is currently an associate dean at the College of Business Administration of San Diego State University. *Id.* ¶ 3. Sunrise contends that Lackritz's declaration and his accompanying report are based on insufficient data and flawed methodologies. Dkt. 94 at 11.

a) Regular Rate

As to the Regular Rate issue, Sunrise contends that, in his original analysis, Lackritz used the wrong time period to calculate the regular rate used for overtime payments. Thus, he used two-week pay periods rather than workweeks to determine whether an employee was paid the correct overtime wage. *Id.* at 12; 29 C.F. R. § 778.109 (the regular rate of pay is determined by "dividing [an employee's] total remuneration for employment . . . in any workweek by the total number of hours actually worked."); Cal. Lab. Code § 500(b) ("'Workweek' . . . mean[s] any seven consecutive days."). As a result, they argue that

17 Plaintiffs contend that a full *Daubert* analysis is not required at the class certification stage but rather, a "tailored" *Daubert* inquiry is appropriate. They contend that this would be limited to whether the expert opinion is reliable and relevant to the Rule 23 inquiry. *See Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 490 (C.D. Cal. 2012). The Ninth Circuit has emphasized, however, that even at the class certification stage, "the trial court must act as a gatekeeper to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards." *Ellis*, 657 F.3d at 982. Since *Wal-Mart v. Dukes* and *Ellis*, many district courts have applied a full *Daubert* analysis at the certification stage. *See* McLaughlin on Class Actions § 3:14 (10th ed. 2013) ("The Supreme Court's decisions reversing class certification in [*Dukes*] and [*Comcast*] should remove any vestigial doubt about the appropriateness of full-blown *Daubert* analysis at the class certification stage."); *Keegan v. Am. Honda Motor Co., Inc.*, 284 F.R.D. 504, 514 (C.D. Cal. 2012) (applying the *Daubert* standard to determine the admissibility of expert reports at the class certification stage); *Grodzitsky v. Am. Honda Motor Co.*, 2014 WL 718431, at *6 (C.D. Cal. Feb. 19, 2014); *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 541-42 (C.D. Cal. 2012) (rejecting "tailored" *Daubert* approach).

Lackritz ignored the possibility that an employee may receive a bonus during one week, but only work overtime in the second week. Thus, his methodology could result in miscalculating the number of actual violations. Lackritz's expert testimony has been excluded in other class certification motions for similar reasons. *See In re Taco Bell Wage & Hour Actions*, 1:07-CV-01314-OWW, 2011 WL 4479730 (E.D. Cal. Sept. 26, 2011) (excluding declaration where Lackritz erroneously opined that putative class members qualified for vacation pay because he improperly determined average hours worked per week by dividing hours worked by pay period instead of workweeks).

Notwithstanding this shortcoming, Sunrise has not shown that Lackritz's report should be excluded on this basis for two principal reasons. *First*, Sunrise failed initially to propound workweek data. Through discovery requests, Plaintiffs sought "All DOCUMENTS (including, without limitation, WAGE STATEMENTS, personnel records, and payroll records) reflecting the payment of bonuses and awards . . . [and] retroactive pay . . . to COVERED EMPLOYEES by YOU . . ." Dkt. 119, Wand Decl. ¶ 5, Exh. D. Sunrise does not dispute that workweek data reflects the payment of bonuses and awards to employees. However, Sunrise initially only produced pay period, rather than workweek data. Sunrise did not provide Plaintiffs with the workweek data until two weeks after Lackritz's deposition, and after Lackritz had submitted his report and declaration. Wand Decl. ¶¶ 12-13, Exh. K-L.

*Second*, Lackritz has filed a supplemental declaration and report based on a later review of the workweek data provided by Sunrise. Dkt. 132-2. This supplemental report did not contain the same, complete analysis of the workweek data that he conducted for the pay period data. However, Lackritz concluded that, for the period from February 2009 to October 2010, Sunrise did not make a regular rate adjustment for any overtime or double overtime compensation paid. Dkt. 132-2, Lackritz Supp. Decl. ¶ 6, Exh. A ¶ d. Ordinarily new evidence cannot be presented for the first time in a reply brief. *Coleman v. Quaker Oats Co.,* 232 F.3d 1271, 1289 n. 4 (9th Cir.2000) ("[I]ssues cannot be raised for the first time in a reply brief."); *Tovar v. U.S. Postal Serv.,* 3 F.3d 1271, 1273 n.3 (9th Cir.1993) ("To the extent that the [reply] brief presents new information, it is improper. Therefore, [certain] portions of the brief are ordered stricken [.]"). However, given the discovery dispute in this case, the supplemental declaration of Lackritz is admissible as to the regular rate issue.

b) Rounding and Meal Periods

Sunrise also contends that the rounding and meal period analyses performed by Lackritz were flawed. *First*, Sunrise argues that the data Lackritz used included time-punch data from prior to February 25, 2009, and with respect to employees located outside of California. *See* Lackritz Depo. 25:16-26:21 (stating his analysis contained "201 data points [of about 6.5 million data points]. . . that . . . would fall prior to the beginning of the class itself."); *id.* 75:20-76:5 ("I did not examine [the data] to see if they were facilities outside the state of California."); Dkt. 91-6, Ward Decl. ¶ 8 n.1. Sunrise has not shown, however, that the inclusion of these shifts resulted in unreliable results. Rather, its expert, Dr. Ward, reached similar conclusions in his analysis of rounding and meal breaks. *See id.* ¶ 8 ("[T]here are relatively small differences between us in these aggregate numbers."). And, at his deposition Ward stated that Lackritz's inclusion of these shifts did not result in significant deficiencies in his analysis. *See* Ward Depo. 80:18-23, 81:9-12. Indeed, Ward states in his declaration that he "follow[ed] the methods used by Dr. Lackritz in

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV13-02171 JAK (PLAx) | Date | June 11, 2014 |
| Title | Betelhem Shiferaw v. Sunrise Senior Living Management, Inc., et al. | | |

paragraph 9 of his declaration and found essentially the same results on rounding." Ward Decl. ¶ 16.[18] The inclusion of a small number of individuals outside of the class in Lackritz's analysis is relevant to the probative value of Lackritz's report. However, the Lackritz declaration cannot be excluded on this basis.

*Second*, Sunrise contends that the analysis of meal periods performed by Lackritz erroneously included shifts in which an employee was not legally entitled to a meal break, including shifts of less than or equal to five hours, non-working shifts categorized as a holiday or similar shift. *See* Ward Decl. ¶ 50 n.18. Thus, Lackritz concluded that 97.6% of all employees had at least one potential missed meal period. The expert proffered by Sunrise calculated this figure at 84.7%. *Id.* ¶ 50. Plaintiffs have not shown that this discrepancy was insignificant.[19]

Ultimately, although Sunrise has raised certain issues as to Lackritz's data set, it has not demonstrated that the reasoning or methodology applied to his analysis of the rounding or meal break claims was unreliable. Thus, these objections go to the weight, and not the admissibility of his opinions. As noted in *Primiano v. Cook*, 598 F.3d 558 (9th Cir. 2010), the test of reliability is flexible. Here, the errors pointed to by Sunrise may call into question the conclusions reached by Lackritz, but they do not demonstrate that his methodology was flawed. Thus, these portions of Lackritz's declaration fall into the category of "[s]haky but admissible evidence [which] is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). Sunrise has submitted expert evidence which contradicts certain of Lackritz's conclusions. It has been weighed in the overall analysis of the Class Certification Motion.[20]

---

18 In opposition to the Lackritz Motion, Plaintiffs also proffered the declaration of another statistical expert, Robert Abbott, who analyzed the degree of statistical difference between the conclusions of Lackritz and Ward. Dkt. 116-1, Abbott Decl. ¶ 6. He concluded that the inclusion of these shifts did not have a statistically significant impact on Lackritz's analysis. *Id.* ¶ 7. However, Abbott did not disclose the methodology he used to reach his opinion that the differences were not statistically significant. Thus, the Court cannot determine whether his analysis was the product of reliable methods under Fed. R. Evid. 702. Even without this declaration, however, Plaintiffs have demonstrated that the differences between Lackritz and Ward's analyses were not substantial.

19 In Lackritz's supplemental declaration, filed with the reply to the Class Certification Motion, he attempts to correct these problems. However, unlike Lackritz's supplement regarding the regular rate issue, these corrections were not made in response to a failure by Sunrise to produce records. Thus, these corrections are improper and are stricken. *Coleman v. Quaker Oats Co.,* 232 F.3d 1271, 1289 n. 4 (9th Cir.2000); *Tovar v. U.S. Postal Serv.,* 3 F.3d 1271, 1273 n. 3 (9th Cir.1993).

20 Sunrise also points out the following discrepancies between Lackritz's report and his declaration:

| **Conclusion** | **Declaration** | **Report** |
|---|---|---|
| Potential short breaks in shifts of 5 to 6 hours | 14,475 (¶ 12) | 14,444 (p. 3) |
| Potential short breaks in shifts of 6 to 10 hours | 656,036 (¶ 13) | 652,809 (p. 3) |
| Potential late breaks in shifts of 6 to 10 hours | 531,237 (¶ 13) | 531,457 (p. 3) |
| Potential short breaks in shifts of 10+ hours | 21,036 (¶ 14) | 22,001 (p. 3) |

Dkt. 94 at 15. As a result, Sunrise contends that the Court cannot determine which of these numbers is correct and whether Lackritz's analysis is reliable. Plaintiffs respond that Lackritz's report contains the correct figures. Any discrepancy between the declaration and the report, therefore, is due to a typographical error on the part of Plaintiffs' Counsel. Dkt. 116 at 14. Under these circumstances, there is not a sufficient basis to exclude Lackritz's

c) Rest Breaks

Sunrise disagrees with the calculation Lackritz made as to the number of missed rest breaks. Lackritz concluded that there were 2.5 million missed rest breaks during the class period. Lackritz calculated this figure by applying the percentage of missed rest breaks calculated by Matern, which was 44.6%, to the entire class period. This method was flawed.

*First*, Lackritz was not aware of the manner in which the sample size was selected by Plaintiffs' Counsel in determining the missed rest break percentage. At his deposition, Lackritz testified that he recommended that Matern select two out of the 60 boxes of rest break logs and daily assignment sheets. Lackritz Depo. 257:5-16. However, Lackritz could not explain how these documents were actually selected. *Id.* 257:22-258:2. Furthermore, Matern did not explain how these documents were selected in his declaration, and did not appear for his deposition. Thus, the methodology used randomly to select the rest break documents is unknown. As a result, Lackritz's rest break conclusions cannot be tested for reliability as required by *Daubert*. *See In re Imperial Credit Indus. Inc., Sec. Litig*., 252 F. Supp. 2d 10005, 1011-12 (C.D. Cal. 2013) ("The rules do not permit an expert to rely upon excerpts from opinions developed by another expert . . . [when] Defendants did not have an opportunity to depose [the other expert].").

*Second*, Lackritz failed to review and verify the rest break calculations made by Matern. At his deposition, Lackritz stated that, as of the time that he signed his declaration, he had not examined any of the 1,427 pages that formed the basis for the missed rest break percentage calculated by Matern. Lackritz Depo. 28:17-29:7. He also stated that he did not verify the number of potential rest breaks or the number of actual rest breaks taken, which were used to calculate the percentage of missed rest breaks by Matern. *Id.* 37:4-18; 195:20-22 ("I was not involved with developing the criteria that was used in the analysis from the log sheet."); *Id.* 213:11-24 ("I took no steps to research or to validate the correctness of any of these [assumptions]."). District courts have excluded similar expert declarations. *See York v. Starbucks Corp.*, 2011 WL 8199987, at *13-15 (C.D. Cal. Nov. 23, 2011) (striking the plaintiffs' expert declaration in a wage and hour class action where the expert made no effort to insure the reliability of the pay data given to him by plaintiffs' counsel).

*Third*, as discussed above, the rest break analysis performed by Matern was based on neither a reliable methodology nor reliable data. As such, it is inadmissible. Lackritz's rest break calculation relied on the Matern Declaration. It did not, therefore, comply with Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of" if it is of the type reasonably relied on by other experts in the field.).

For these reasons, Lackritz's rest break calculation is STRICKEN. *See In re TMI Litig.*, 193 F.3d 613, 697 (3d Cir. 1999) (affirming district court's exclusion of expert opinion based on summaries provided by counsel).

*   *   *

---

report and declaration.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

| | | | |
|---|---|---|---|
| Case No. | LA CV13-02171 JAK (PLAx) | Date | June 11, 2014 |
| Title | Betelhem Shiferaw v. Sunrise Senior Living Management, Inc., et al. | | |

The Lackritz Motion is GRANTED IN PART. Thus, paragraph 17 of the Lackritz Declaration and the final paragraph of his report, attached as Exhibit A to the Lackritz Declaration, are stricken. However, the remainder of the Lackritz Declaration and report is admissible.

## V. <u>Conclusion</u>

For the reasons stated, the Matern Motion and Lackritz Motion are GRANTED IN PART. The Class Certification Motion is also GRANTED IN PART. Specifically, it is granted with respect to the Regular Rate Subclass, and claims for nonpayment for time worked for Meal Period Subclasses A and B. It is denied for the claims for meal period premiums for Meal Period Subclass A and for the remaining six subclasses.

The Court has reviewed the parties' Joint Report Regarding Further Mediation (Dkt. 142) and directs counsel to confer and file an updated report on or before June 25, 2014, with respect to the parties' respective or collective views on whether a further mediation would be productive and, if so, the agreed upon mediator and anticipated date of its completion.

**IT IS SO ORDERED.**

_______ : _______

Initials of Preparer ak