UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV13-02171-JAK (PLAx) | Date | March 21, 2016 |
| Title | Betelhem Shiferaw v. Sunrise Senior Living Management, Inc., et al. | | |

| | |
|---|---|
| Present: The Honorable | JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE |

| | |
|---|---|
| Andrea Keifer | Not Reported |
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:** **(IN CHAMBERS) ORDER RE PLAINTIFFS' MOTION FOR RECONSIDERATION OF THE COURT'S ORDER DENYING CERTIFICATION OF THE MEAL PERIOD SUBCLASS (DKT. 201)**

## I. <u>Introduction</u>

Betelhem Shiferaw ("Shiferaw") and Renee Tameifuna ("Tameifuna") (collectively, "Plaintiffs") brought these consolidated class actions against Sunrise Senior Living Inc., Sunrise Senior Living Management, Inc. and Sunrise Senior Living Services, Inc. (collectively, "Sunrise" or "Defendants"). Complaint, Dkt. 56. Plaintiffs' claims are based on alleged wage and hour violations with respect to current and former non-exempt, hourly employees of Sunrise who worked in California. *Id.*

The Complaint advances the following causes of action: (i) Cal. Lab. Code §§ 226.7 and 512(a) (failure to provide required meal periods); (ii) Cal. Lab. Code § 226.7 (failure to provide rest breaks); (iii) Cal. Lab. Code §§ 510 and 1198 (failure to pay overtime); (iv) Cal. Lab. Code §§ 1194, 1197, 1197.1 (failure to pay minimum wage); (v) Cal. Lab. Code §§ 201 and 202 (failure to pay wages upon discharge); (vi) Cal. Lab. Code § 226(a) (failure to provide accurate wage statements); (vii) Cal. Lab. Code §§ 226, 1174 (failure to maintain required records); (viii) Cal. Bus. & Prof. Code §§ 17200 *et seq*.; and (ix) Cal. Lab. Code §§ 2698 *et seq.* (penalties under the Private Attorneys General Act ("PAGA"), as a representative action). Complaint, Dkt. 56.

On February 11, 2014, Plaintiffs brought a motion to certify nine subclasses of approximately 11,700 non-exempt, hourly employees who have worked for Sunrise in California since February 25, 2009. Dkt. 83 at 7. On June 11, 2014, that motion was granted in part and denied in part ("Class Certification Order"), Dkt. 147. Plaintiffs' proposed Regular Rate Subclass and claims for nonpayment for time worked for Meal Period Subclasses A and B were certified. *Id.* at 35. The requested certification of the remaining subclasses, including the Meal Period Subclass, was denied. *Id.* at 14, 20.

On February 27, 2015, each of the parties filed two motions. Plaintiffs filed its first motion to amend the Class Certification Order or, in the alternative, a motion for reconsideration. Dkt. 169, 170. There, Plaintiffs sought the following relief:

- Amend the Class Certification Order to redefine the class periods for the certified Meal Rounding and Regular Rate Subclasses to end on April 27, 2015;
- Amend the Class Certification Order to certify the following claims to the extent they are strictly derivative of the claims certified by the Class Certification Order and any additional claims certified – Cal. Lab. Code §§ 201 and 202 (failure to pay wages upon discharge); Cal. Lab. Code § 226 (failure to provide accurate wage statements); and Cal. Bus. & Prof. Code § 17200 *et seq.*;
- Amend the Class Certification to certify the Rounding and Rest Break Subclasses;
- Amend the Class Certification Order to appoint the Plaintiffs as representatives for the additional subclasses; and
- Amend the Class Certification Order to appoint Capstone Law APC and the Matern Law Group as Class Counsel for the additional subclasses.

On the same day, Sunrise filed a motion to strike Plaintiffs' PAGA claims (Dkt. 167) and a motion for partial summary judgment (Dkt. 168). These motions are addressed in a separate order.

On November 6, 2015, Plaintiffs filed a second motion for reconsideration of the order denying class certification of the Meal Period Subclass (the "Motion"), Dkt. 201. Plaintiffs asked for reconsideration of the Class Certification Order (Dkt. 147) pursuant to Fed. R. Civ. P. 54(b) and Local Rule 7-18 on the grounds that a recent decision, *Safeway, Inc. v. Superior Court*, 238 Cal. App. 4th 1138 (2015), *review denied*, Cal. App. 2 Dist. (Oct. 21, 2015), reflects an intervening change in controlling law that compels certification of the Meal Break Subclass.

A hearing on the Motion was held on February 29, 2016. Dkt. 208. For the reasons stated in this Order, the Motion is **DENIED**.

## II. <u>Factual Background</u>

The Class Certification Order sets forth the following background of this action:

### A. In General

Sunrise is a "provider of senior living services, including independent living, assisted living, and care for individuals with Alzheimer's and other forms of memory loss." Declaration of Jennifer Delise ("Delise Decl."), Dkt. 91-4, ¶ 3. Sunrise currently operates 41 communities located throughout California. *Id.* ¶ 4. Prior to certain divestitures, the dates of which have not been provided, Sunrise had 59 locations in California. *Id.*

Sunrise employs individuals who work in a range of positions at these communities. They include Care Managers, who are responsible for providing “hands on care” and “physical and emotional support” to particular residents. Delise Decl. ¶ 6; Declaration of Melissa Grant (“Grant Decl.”), Dkt. 110, Exh. 11.

Tameifuna was employed as a non-exempt Care Manager, Lead Care Manager, and Medical Manager from May 25, 2009 to May 15, 2012 at the Sunrise location in Palo Alto, California. Declaration of Renee Tameifuna (“Tameifuna Decl.”), Dkt. 78-2 ¶ 2. Shiferaw was employed as a non-exempt Care Manager and Lead Care Manager from approximately June 2010 through June 2013 at the Sunrise retirement community in Beverly Hills, California. Declaration of Betelhem Shiferaw (“Shiferaw Decl.”), Dkt. 78-5 ¶ 2. Certain of Plaintiffs’ proposed subclasses are limited to Care Managers; others include those who have held different jobs.

### B. Timekeeping

To track time worked by employees, Sunrise communities use an electronic timekeeping system called Kronos. Delise Decl. ¶ 7. It requires an employee to apply his or her finger to a device that recognizes his or her fingerprint. Based on that recognition, Kronos records the time the recognized employee started and stopped work and when he or she took meal periods. *Id.* Rest breaks are not recorded. *Id.* When corrections to the Kronos records are necessary, employees use correction sheets, called “Time Exception Reports.” *Id.* ¶ 8. Such forms may be filled out when an employee forgets to clock in or out or experiences an error with the Kronos system. *Id.*

Sunrise has a policy of rounding the time entries by employees to the nearest quarter hour. Grant Decl., Exh. 6, Delise Depo. 36:17-37:14. Under this policy, when an employee “punches in” up to 7 minutes after the quarter hour, the entry is rounded back to the nearest quarter hour. When an employee punches in more than 7 minutes after the quarter hour, the entry is rounded forward to the nearest quarter hour. *Id.*

### C. Meal and Rest Periods

Sunrise has official meal and rest break policies. They provide that employees are to receive an unpaid 30-minute uninterrupted meal break for every five-hour shift, and a ten-minute paid rest break for every four hours, or major portion thereof, that they work. Delise Decl., Exh. A-1. However, Plaintiffs and other putative class members claim that they have not been provided rest or meal periods in compliance with California law. Thus, some claim that they did not receive second rest periods during shifts of between 6 and 8 hours (Tameifuna Decl. ¶ 12; Shiferaw Decl. ¶ 11), others claim that their meal and rest breaks were interrupted or delayed due to emergency calls involving a resident (patient) in the community. Tameifuna ¶ 8; Shiferaw Decl. ¶ 10.

**D. Cross-over Meetings**

Lead Care Managers -- and on certain occasions Care Managers -- at Sunrise are required to participate in "cross-over meetings." Grant Decl., Exh. 14; Shiferaw Decl. ¶ 12. Cross-over meetings occur at shift changes and generally last approximately 10 to 15 minutes. Grant Decl., Exh. 14. At these meetings, outgoing Lead Care Managers inform incoming Lead Care Managers of relevant information about residents*.* *Id*.; Shiferaw Decl. ¶¶ 12-13.

**E. Use of Communications Devices and Response to Resident Calls**

Certain Sunrise employees are required to carry a communications device while they are working. Grant Decl., Exh. 6, Delise Depo. 56:9-57:18. In addition, Care Managers are required to respond quickly to calls for assistance by residents. *Id.*, Exh. 11. Plaintiffs claim that, as a result of these policies, they were denied uninterrupted meal and rest breaks. Shiferaw Decl. ¶ 10; Tameifuna Decl. ¶ 8.

**F. Staffing at Sunrise Communities**

Sunrise provides software to assist department managers create schedules and determine how many staff members are necessary to meet the needs of the residents at any given time. Dkt. 135, Grant Supp. Decl., Exh. 9 (under seal); Dkt. 132-1, Grant Supp. Decl., Exh. 6, Pham Depo. 93:9-100:2; *id*., Exh. 7, Carlson Depo. 99:14-100:13; *id*., Exh. 3, Cherwin Depo. 23:17-25:21. This software generates "target hours" for each job position within each community. Grant Supp. Decl., Exh. 9. The "target hours" figure refers to the number of hours allotted to each job position during every 24-hour period. Pham Depo. 95:9-25.

Department managers are trained to attempt to staff their departments in a way that the total hours worked by those in each job position match the target number. *Id*. For example, if the target figure for Care Managers is 24 hours, and there are three shifts each of which is eight hours, a department manager can schedule one Care Manager for each of the shifts. Grant Supp. Decl., Exh. 9. However, department managers are given discretion with respect to the allocation of the total number of hours throughout the day. *Id.* So, if the target hours figure for Care Managers during a 24-hour period is 48 hours, then the department manager can schedule two Care Managers for each shift or, alternatively, can schedule more Care Managers for certain shifts and fewer on others, depending on resident needs at certain times of day. *Id*.; Pham Depo. 95:9-25.

For Care Manager positions, the target hours are based on the number of residents who live in a community as well as the expected levels of service. *Id*. For other positions, target hours are determined by the budget that has been approved for the community.

> *Id.* Plaintiffs contend that Sunrise's use of this software resulted in systematic understaffing, thereby preventing employees from taking compliant meal periods.

Class Certification Order, Dkt. 147 at 2-4.

## III. Procedural Background

On February 25, 2013, Tameifuna filed a putative class action against Sunrise Senior Living, Inc., Sunrise Senior Living Management, Inc. and Charmine Doherty in the Santa Clara County Superior Court. Tameifuna Complaint, *Tameifuna v. Sunrise Senior Living*, No. 2:13-CV-06294-JAK-PLA (C.D. Cal. Mar. 26, 2013) ("Tameifuna Action") (Dkt. 2, Ex. B at 9-35). The action was removed on March 26, 2013. Notice of Removal, Tameifuna Action, Dkt. 1.

On March 18, 2013, Shiferaw filed a putative class action against Sunrise Senior Living Management, Inc. and Jason Malone in the Los Angeles Superior Court. Shiferaw Complaint, Dkt. 1, Ex. A at 20-36. The action was removed on March 26, 2013. Notice of Removal, Dkt. 1.

On August 27, 2013, the Tameifuna Action was transferred to the Central District of California. Tameifuna Action, Dkt. 43. On October 15, 2013, the Tameifuna Action was consolidated with the action brought by Shiferaw. Dkt. 54. On October 21, 2013, Plaintiffs filed the Consolidated Class Action Complaint, naming the Sunrise defendants. Dkt. 56.

On February 6, 2014, Plaintiffs moved for class certification (Dkt. 78) as to the following nine subclasses:

1. Regular Rate Subclass: All persons who worked as non-exempt or hourly employees of Defendants at one or more of their locations in California at any time from February 25, 2009 to October 2010[1] who were paid a non-discretionary bonus and/or a retroactive pay increase during one or more pay periods in which they were also paid overtime wages;

2. Rounding Subclass: All persons who work or worked as non-exempt or hourly employees of Defendants at one or more of their locations in California at any time from February 25, 2009 until the date of the order granting class certification whose actual clock-in and clock-out time punches for their shifts were rounded to the nearest quarter hour;

---

[1] At the April 28, 2014 hearing on class certification, Plaintiffs orally amended the class period for this subclass from "February 25, 2009 until the date of the order granting class certification" to "February 25, 2009 to October 2010" based on the review of the workweek data provided by Defendants after the motion was filed. Dkt. 147 at 4 n.1. Plaintiffs did not provide a precise date in October. *Id.* However, in their Opposition to the motion for summary judgment brought by Sunrise, Plaintiffs state that the class period "runs from February 25, 2009 through September 30, 2010." Dkt. 173 at 7 n.1.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV13-02171-JAK (PLAx) | Date | March 21, 2016 |
| Title | Betelhem Shiferaw v. Sunrise Senior Living Management, Inc., et al. | | |

3. Meal Period Rounding Subclass A: All persons who work or worked as non-exempt or hourly employees of Defendants at one or more of their locations in California at any time from February 25, 2009 until the date of the order granting class certification whose actual clock-in and clock-out time punches for at least one meal period were up to seven minutes before or after the quarter hour and whose meal period clock-in and clock-out time punches for that meal period were rounded to that quarter hour;

4. Meal Period Rounding Subclass B: All persons who work or worked as non-exempt or hourly employees of Defendants at one or more of their locations in California at any time from February 25, 2009 until the date of the order granting class certification whose actual clock-in and clock-out time punches for at least one meal period show a meal period between 38 and 44 minutes in length but whose clock-out and clock-in time punches were rounded to the nearest quarter hour;

5. Meal Period Subclass: All persons who work or worked as non-exempt or hourly employees of Defendants at one or more of their locations in California at any time from February 25, 2009 until the date of the order granting class certification whose time records show missed, late, or less than 30-minute meal periods for work periods of six hours or longer;[2]

6. Rest Break Subclass: All persons who work or worked as non-exempt or hourly employees of Defendants at one or more of their locations in California at any time from February 25, 2009 until November 15, 2012 who worked for a period of time between six and eight hours or between ten and twelve hours;

7. On-Call Subclass: All Care Managers[3] who work or worked as non-exempt or hourly employees of Defendants at one or more of their locations in California at any time from February 25, 2009 until the date of the order granting class certification who were required to carry a pager, scout phone, or radio during their shifts;

8. Off-The-Clock Subclass: All Care Managers[4] who work or worked as non-exempt or hourly employees of Defendants at one or more of their locations in California at any time from February 25, 2009 until the date of the order granting class certification who participated in required "cross-over meetings" before or after an eight-hour shift; and

[2] In the Motion, Plaintiffs seek reconsideration of the prior decision to deny certification of this subclass.
[3] Plaintiffs narrowed the On-Call Subclass from "[a]ll persons" to "[a]ll Care Managers" in their reply to the Class Certification Motion. Dkt. 132 at 13; Dkt. 147 at 5 n.2.
[4] Plaintiffs narrowed the subclass definition from "[a]ll persons" to "[a]ll Care Managers" at the April 28, 2014 hearing on the class certification motion. Dkt. 147 at 5 n.3.

9. Rest Break Coverage Subclass: All persons who work or worked as non-exempt or hourly employees of Defendants at one or more of their locations in California at any time from February 25, 2009 until class certification, and who worked shifts of three and a half hours or more.

The class certification motion was granted in part and denied in part on June 11, 2014. Dkt. 147. It was granted as to the Regular Rate Subclass and the "claims for nonpayment for time worked for Meal Period Subclasses A and B." *Id.* at 35. It was denied as to the "claims for meal period premiums for Meal Period Subclass A and for the remaining six subclasses." *Id.*

On June 12, 2014, the action was stayed pending the outcome of settlement discussions. Dkt. 150. On June 25, 2014, Plaintiffs appealed the Class Certification Order pursuant to Fed. R. Civ. P. 23(f). *Shiferaw v. Sunrise Senior Living, Inc.*, No. 14-80092 (9th Cir.). On September 26, 2014, the appeal was denied. Dkt. 156. On January 12, 2015, the action was reinstated and a scheduling order was issued. Dkt. 162. On February 27, 2015, the pending motions were filed, and on November 6, 2015, this Motion was filed.

## IV. Analysis

### A. Legal Standard for Fed. R. Civ. P. 54(b): Authority to Reconsider

Fed. R. Civ. P. 54(b) provides that any order "that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." The Ninth Circuit has stated that reconsideration of a prior order "is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *Nunes v. Ashcroft*, 375 F.3d 805, 807 (9th Cir. 2003), *cert denied*, 543 U.S. 1188 (2005). "Thus, the Court cannot grant a reconsideration motion unless the moving party establishes that one of these circumstances exists." *Quevedo v. Macy's, Inc.*, No. CV 09-01522 GAF MANX, 2011 WL 6961598, at *2 (C.D. Cal. Oct. 31, 2011).

Local Rule 7-18 provides that a motion for reconsideration may be made "only on the grounds of (a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider material facts presented before such decision." Local Rule 7-18 provides that no motion for reconsideration shall "in any manner repeat any oral or written argument made in support of or in opposition to the original motion."

**B. Legal Standard for Meal Periods under Cal. Lab. Code § 512(a)**

"A meal period of not less than 30 minutes must be provided within the first five hours of work." Cal. Lab. Code § 512(a); *see also Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004, 1041 (2012) ("We conclude that, absent waiver, section 512 requires a first meal period no later than the end of an employee's fifth hour of work, and a second meal period no later than the end of an employee's 10th hour of work.").

**C. Prior Order**

The Class Certification Order concluded that Plaintiffs had not satisfied the commonality requirement for the Meal Period Subclass:

> Sunrise's California meal period policy provides: "There is no circumstance under which a team member whose workday is more than six (6) hours but less than ten (10) hours may waive a meal period. There is also no circumstance under which a team member whose workday is more than twelve hours may waive a meal period." Grant Decl., Exh. 2. Plaintiffs contend that any missed, late, or shortened meal periods were the result of this policy. Dkt. 82 at 21.
>
> This policy does not, on its face, violate California law. Nevertheless, Plaintiffs apparently claim that, because Sunrise had a uniform policy prohibiting employees from waiving meal breaks for shifts of 6 to 10 hours in length, any missed meal break in the time records "leads inexorably to the conclusion" that Sunrise failed to provide a meal break. *Ordonez v. Radio Shack, Inc.*, CV 10-7060-CAS JCGX, 2013 WL 210223 (C.D. Cal. Jan. 17, 2013) (denying a class certification motion premised on the same theory). Plaintiffs have not provided evidence that missed meal periods were the result of Sunrise's meal period policy. Nor have Plaintiffs presented any evidence that Sunrise had a policy that required employees to forgo meal breaks. Thus, Plaintiffs' claim that the policy caused all meal period violations is unpersuasive and does not meet the standard of Rule 23.
>
> The Court previously addressed a claim that Sunrise had a common policy of requiring employees to miss meal and rest breaks. *Purnell v. Sunrise Senior Living Management, Inc., et al*., SA CV10-000897 JAK (MLGx), Dkt. 89 (Feb. 27, 2012). In *Purnell*, plaintiff presented similar evidence of the policy of Sunrise as to meal breaks. *Id*. at 5. The Court concluded, as it does here, that the official meal break policy of Sunrise does not support the contention that its policy was for employees to miss meal breaks. *Id.*
>
> This case is distinguishable from *Purnell* in that Plaintiffs have presented additional evidence, in the form of declarations of potential class members, regarding the meal period policy. Some of these former employees state that they were denied meal periods because of their heavy workload and inability to find another person who could perform

> their duties while they took a meal break. *See* Adcock Decl. ¶ 5; Dillard Decl. ¶ 5. Others stated that their meal breaks were interrupted by calls for assistance by residents of Sunrise. Davie Decl. ¶ 10; Jamar Decl. ¶ 12; Mendez Decl. ¶ 6. Others do not give a reason for the denial of the meal period. Davis Decl. ¶ 5. However, these declarations do not demonstrate the existence of a systematic policy requiring employees to miss or take shorter meal periods. Rather, these and the declarations submitted by Sunrise show that there are "numerous possibilities as to why certain employees may have had a late, short, or missed meal break during a given shift." *Ordonez*, 2013 WL 210223, at *6-8; *see also* Olivares Decl. ¶ 10 (driver who takes residents on full-day outings and chooses not to take meal periods because "would rather sit and eat with residents"); Dove Decl. ¶ 10 (for shorter shifts of 5 or 6 hours, she chooses not to take meal breaks); Adcock Decl. ¶ 5 (denied meal breaks because of heavy workload); Dillard Decl. ¶ 5 (denied meal breaks because was unable to find coverage).
>
> In their reply to the Class Certification Motion, Plaintiffs sought to show the nexus among the claims of the Meal Period Subclass by arguing that missed or shortened meal periods were the result of common staffing policies adopted by Sunrise. Dkt. 132 at 17. In support of this position, Plaintiffs attached evidence in the form of the software used by Sunrise to help department managers determine staffing. Dkt. 135, Grant Supp. Decl., Exh. 9 (under seal); Dkt. 132-1, Grant Supp. Decl., Exh. 6, Pham Depo. 93:9-100:2; *id*., Exh. 7, Carlson Depo. 99:14-100:13; *id*., Exh. 3, Cherwin Depo. 23:17-25:21. Plaintiffs contend that Sunrise used this software in a manner that resulted in systematic understaffing, thereby preventing employees from taking compliant meal periods.
>
> The evidence submitted by Plaintiffs shows that department managers were required to use the software in scheduling employees, and were encouraged to ensure that the time allotted for each job did not exceed the "target hours" calculated by the system. Dkt. 135, Grant Supp. Decl., Exh. 9 (under seal); Dkt. 132-1, Grant Supp. Decl., Exh. 6, Pham Depo. 93:9-100:2; *id*., Exh. 7, Carlson Depo. 99:14-100:13; *id*., Exh. 3, Cherwin Depo. 23:17-25:21. However, Plaintiffs have not presented any evidence that any missed or late meal breaks resulted from the use of the software. Therefore, Plaintiffs have not shown that the claims of the Meal Period Subclass are linked by a common practice.[5]

Dkt. 147 at 16-17.

The Class Certification Order also concluded that predominance was not shown:

[5] [Footnote in Class Certification Order, Dkt. 147 at 17 n.6] At the hearing on the Class Certification Motion, Plaintiffs' counsel argued that a common question arose from the discretion Sunrise managers have in scheduling meal breaks. However, Plaintiffs did not cite any evidence that employees were scheduled to take late meal periods or miss meal periods. Rather, the evidence shows only that certain employees missed or took late meal periods. It does not show that they were scheduled to do so. Sunrise is required only to provide a compliant meal period; it was not required to ensure that such a meal period was taken.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV13-02171-JAK (PLAx) | Date | March 21, 2016 |
| Title | Betelhem Shiferaw v. Sunrise Senior Living Management, Inc., et al. | | |

> Plaintiffs have not shown that any common issue predominates. The evidence indicates that the software does not create automatic, mandatory staffing levels. Rather, the target hours are based on data about resident care needs. These have been determined by shift coordinators at each Sunrise community based on their assessments of the needs of residents. Pham Depo. 99:1-7. And, although the software generates target hours, shift coordinators have discretion to schedule employees as needed based on the various needs of residents throughout a 24-hour period. Carlson Depo. 100:5-14. For example, one shift coordinator testified that she used the software as a "tool" to help avoid overstaffing, but that she used her discretion to schedule more Care Managers in the mornings and fewer in the afternoons because less care was needed for residents at that time. Pham Depo. 96:8-25; 98:21-99:7. For these reasons, the evidence presented shows that individualized inquiries would be required to determine whether use of the software resulted in understaffing. For example, determinations would have to be made about how each community evaluated the care needs of its residents and how, as a result of such data, each manager exercised his or her discretion to schedule employees.
>
> Furthermore, Defendants have presented evidence that shows a substantial variation as to when and how meal periods were scheduled. Some Sunrise employees schedule their own meal periods, while others have their meal period times scheduled by a supervisor. *See, e.g.,* Panuco Decl. ¶ 4; DeBernardi-Lieber Decl. 6; Jamar Depo. 148:9-11; Richmond Decl. ¶ 13; Hoang Decl. ¶ 5; Davis Decl. ¶ 4; Hartman Decl. ¶ 6; DeLeon Decl. ¶ 10; Carlson Decl. ¶ 11. Defendants also have `presented evidence that some employees choose to take meal periods at the scheduled times, while others take them later than those times. See, e.g., Hartman Decl. ¶ 6; Carlson Decl. ¶ 12; Longwith Decl. ¶ 9; Manna Decl. ¶ 12. Sunrise also has presented statistical evidence through its expert, Dr. Michael Ward, which shows a wide variation in meal breaks taken depending on job classifications, departments, and Sunrise locations. Ward Decl. ¶¶ 11, 45, Dkt. 91-6. Ward's analysis provides additional support for the view that the differences in missed or short meal breaks among these groups is not due to random chance or the effect of a common practice or policy. *Id*. ¶¶ 11, 62, 64.
>
> For these reasons, Plaintiffs have failed to show that any common question arising from use of the software would predominate in connection with an inquiry into whether employees were denied compliant meal periods. Instead, the question whether and when team members missed or took late or shortened meal periods would require numerous individualized inquiries into the staffing at each Sunrise facility, how meal periods were scheduled, and why meal periods were missed. Therefore, the predominance requirement has not been satisfied.

Dkt. 147 at 17-18. Thus, the Court denied Plaintiffs' class certification motion as to the Meal Period Subclass.

### D. Application

Plaintiffs argue that the *Safeway* decision represents "an intervening change in controlling law." *Nunes*, 375 F.3d at 807. This argument is unpersuasive for two reasons, either of which warrants the denial of the Motion.

#### 1. Whether the Court Must Apply State Law to the Issue of Class Certification

Although California courts may apply certain California procedural rules as to when representative actions are appropriate, federal courts look to Fed. R. Civ. P. 23. In a federal proceeding, the Federal Rules of Civil Procedure control even if their application is outcome-determinative. *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010) ("The framework for our decision is familiar. We must first determine whether Rule 23 answers the question in dispute. If it does, it governs—[the state] law notwithstanding—unless it exceeds statutory authorization or Congress's rulemaking power. We do not wade into *Erie*'s murky waters unless the federal rule is inapplicable or invalid.") (internal citations omitted). *See also id.* at 388-99 ("The question in dispute is whether Shady Grove's suit may proceed as a class action. Rule 23 provides an answer . . . Thus, Rule 23 provides a one-size-fits-all formula for deciding the class-action question. Because [the state law] attempts to answer the same question . . . it cannot apply in diversity suits unless Rule 23 is ultra vires."); *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 947 (9th Cir. 2011) ("Federal Rule of Civil Procedure Rule 23 governs the class-certification issue even if the underlying claim arises under state law.").

"The U. S. Supreme Court has made it clear that under the Erie doctrine state law is not controlling over the Federal Rules of Civil Procedure." *Seltzer v. Chesley*, 512 F.2d 1030, 1034 (9th Cir. 1975) (citing *Hanna v. Plumer*, 380 U.S. 460 (1965)).

In light of these controlling standards, in a diversity action pending in a federal court, state law such as the *Safeway* decision does not apply to the interpretation of Rule 23. As another district court concluded, "[t]he Court is of the view that the Supreme Court of the United States has spoken on this issue and that this Court is under no obligation to follow the ruling of a California intermediate court of appeal (or indeed a ruling of the California Supreme Court) that is inconsistent with controlling Supreme Court precedent." *Quevedo*, 2011 WL 6961598, at *1.

For the foregoing reasons, the Motion is **DENIED**.

#### 2. Whether the *Safeway* Decision is Controlling

Even if the application of *Safeway* were appropriate, it is not controlling law. "Controlling law" refers to "binding precedent only." *McNamara v. Royal Bank of Scotland Grp., PLC,* 2013 WL 1942187, at *3 (S.D.Cal. May 9, 2013); *Zakaria v. Gerber Products Co.*, No.

LACV1500200JAKEX, 2015 WL 4379743, at *2 (C.D. Cal. July 14, 2015). As the Ninth Circuit has explained:

> When interpreting state law, federal courts are bound by decisions of the state's highest court. In the absence of such a decision, a federal court must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance.

*Strother v. S. California Permanente Med. Grp.*, 79 F.3d 859, 865 (9th Cir. 1996) (internal citations and quotations omitted). *See also Zakaria*, 2015 WL 4379743, at *2 ("In interpreting California law, federal courts are to 'predict as best we can what the California Supreme Court would do in these circumstances.'") (quoting *Pacheco v. United States,* 220 F.3d 1126, 1131 (9th Cir.2000)). However, "in the absence of convincing evidence that the highest court of the state would decide differently, a federal court is obligated to follow the decisions of the state's intermediate courts." *In re Kirkland*, 915 F.2d 1236, 1239 (9th Cir. 1990) (internal citations and quotations omitted). *See also Ryman v. Sears, Roebuck & Co.*, 505 F.3d 993, 994 (9th Cir. 2007) ("Today we reiterate the rule that when (1) a federal court is required to apply state law, and (2) there is no relevant precedent from the state's highest court, but (3) there *is* relevant precedent from the state's intermediate appellate court, the federal court must follow the state intermediate appellate court decision unless the federal court finds convincing evidence that the state's supreme court likely would not follow it."); *Am. Triticale, Inc. v. Nytco Servs., Inc.*, 664 F.2d 1136, 1143 (9th Cir. 1981). "In particular this is true where the intermediate state court has determined the precise question in issue in an earlier suit between the same parties, and the highest court of the state has refused review." *Stoner v. New York Life Ins. Co.*, 311 U.S. 464, 467 (1940).

Here, there is convincing evidence of how the California Supreme Court would decide the relevant issue. In *Brinker*, the issue was presented to the California Supreme Court. 53 Cal. 4th at 1053. The Court declined to adopt the rebuttable presumption that Justice Wedergar set forth in her concurring opinion. Therefore, *Safeway*, which adopts the position of Justice Wedergar, does not represent controlling law. *See also Coleman v. Jenny Craig*, Inc., No. 11CV1301-MMA DHB, 2014 WL 808658, at *6 (S.D. Cal. Feb. 27, 2014) ("*Benton* is not 'controlling' because it is a California appellate court's interpretation of *Brinker*."). Plaintiffs' argue that this Court should assume that, because there are now Justices on the California Supreme Court who were appointed after the decision in *Brinker*, that Court would now adopt the position set forth in Justice Wedergar's concurring opinion. There is no legal principle that warrants such speculation in determining the state of California law.

For this separate reason, the Motion is **DENIED**.

3. Whether the Application of the Safeway Presumption Would Change the Prior Denial of Class Certification

Even if the *Safeway* presumption were applied, it would not change the outcome as to the denial of certification of the Meal Period Subclass. *Safeway* adopted the rebuttable presumption adopted by Justice Werdegar in her concurrence in *Brinker*. As Justice Werdegar explained:

> If an employer's records show no meal period for a given shift over five hours, a rebuttable presumption arises that the employee was not relieved of duty and no meal period was provided . . . . An employer's assertion that it did relieve the employee of duty, but the employee waived the opportunity to have a work-free break, is not an element that a plaintiff must disprove as part of the plaintiff's case-in-chief. Rather, as the Court of Appeal properly recognized, the assertion is an affirmative defense, and thus the burden is on the employer, as the party asserting waiver, to plead and prove it. While individual issues arising from an affirmative defense can in some cases support denial of certification, they pose no per se bar. Instead, whether in a given case affirmative defenses should lead a court to approve or reject certification will hinge on the manageability of any individual issues. For purposes of class action manageability, a defense that hinges liability *vel non* on consideration of numerous intricately detailed factual questions, as is sometimes the case in misclassification suits, is different from a defense that raises only one or a few questions and that operates not to extinguish the defendant's liability but only to diminish the amount of a given plaintiff's recovery. We have long settled that individual damages questions will rarely if ever stand as a bar to certification. "In almost every class action, factual determinations [of damages] . . . to individual class members must be made. Still we know of no case where this has prevented a court from aiding the class to obtain its just restitution. Indeed, to decertify a class on the issue of damages or restitution may well be effectively to sound the death-knell of the class action device." *B.W.I. Custom Kitchen v. Owens–Illinois, Inc*., 191 Cal. App. 3d 1341, 1354 (1987). Instead, we have encouraged the use of a variety of methods to enable individual claims that might otherwise go unpursued to be vindicated, and to avoid windfalls to defendants that harm many in small amounts rather than a few in large amounts. Representative testimony, surveys, and statistical analysis all are available as tools to render manageable determinations of the extent of liability. Given these settled principles, Brinker has not shown the defense it raises, waiver, would render a certified class categorically unmanageable. Instead, it remains for the trial court to decide on remand, in the fullness of its discretion, whether in this case methods exist sufficient to render class treatment manageable. As to that question, neither the full court nor I express any opinion.

*Brinker*, 53 Cal. 4th at 1054-55 (internal citations omitted).

Under this approach, applying the rebuttable presumption of *Safeway*, the determination of whether to certify a class would remain fact-specific. It depends on the number and type of

defenses that a defendant may reasonably raise at trial. Here, Defendants state that they may raise the following individualized defenses to Plaintiffs' proposed Meal Period Subclass:

- The employee chose not to take breaks that were provided;
- The employee took breaks despite claiming they were not provided, authorized or permitted and notwithstanding time records showing that the employee did not take a break;
- If the employee were interrupted during a break to return to work, the employee was provided a compliant break at a later time;
- The employee was paid a meal or rest period premium for any break that was not provided;
- The employee chose to clock back in early from a break; and
- The employee chose to take a break after the end of the fifth hour of work.

Opposition, Dkt. 203 at 15 (citing Opposition to Trial Plan, Dkt. 91-1 at 11). As the Class Certification Order concluded, some evidence has been presented that supports these defenses that are individualized. The Class Certification Order found that Plaintiffs had not shown commonality:

> Plaintiffs have presented additional evidence, in the form of declarations of potential class members, regarding the meal period policy. Some of these former employees state that they were denied meal periods because of their heavy workload and inability to find another person who could perform their duties while they took a meal break. *See* Adcock Decl. ¶ 5; Dillard Decl. ¶ 5. Others stated that their meal breaks were interrupted by calls for assistance by residents of Sunrise. Davie Decl. ¶ 10; Jamar Decl. ¶ 12; Mendez Decl. ¶ 6. Others do not give a reason for the denial of the meal period. Davis Decl. ¶ 5 . . . . [T]hese and the declarations submitted by Sunrise show that there are "numerous possibilities as to why certain employees may have had a late, short, or missed meal break during a given shift." *Ordonez*, 2013 WL 210223, at *6-8; *see also* Olivares Decl. ¶ 10 (driver who takes residents on full-day outings and chooses not to take meal periods because "would rather sit and eat with residents"); Dove Decl. ¶ 10 (for shorter shifts of 5 or 6 hours, she chooses not to take meal breaks); Adcock Decl. ¶ 5 (denied meal breaks because of heavy workload); Dillard Decl. ¶ 5 (denied meal breaks because was unable to find coverage).

Dkt. 147 at 16-17.

The Class Certification Order also concluded that Plaintiff had not shown that common issues predominate:

> The evidence indicates that the software does not create automatic, mandatory staffing levels. Rather, the target hours are based on data about resident care needs. These have been determined by shift coordinators at each Sunrise community based on their

> assessments of the needs of residents. Pham Depo. 99:1-7. And, although the software generates target hours, shift coordinators have discretion to schedule employees as needed based on the various needs of residents throughout a 24-hour period. Carlson Depo. 100:5-14. For example, one shift coordinator testified that she used the software as a "tool" to help avoid overstaffing, but that she used her discretion to schedule more Care Managers in the mornings and fewer in the afternoons because less care was needed for residents at that time. Pham Depo. 96:8-25; 98:21-99:7. For these reasons, the evidence presented shows that individualized inquiries would be required to determine whether use of the software resulted in understaffing. For example, determinations would have to be made about how each community evaluated the care needs of its residents and how, as a result of such data, each manager exercised his or her discretion to schedule employees.
>
> Furthermore, Defendants have presented evidence that shows a substantial variation as to when and how meal periods were scheduled. Some Sunrise employees schedule their own meal periods, while others have their meal period times scheduled by a supervisor. *See, e.g.,* Panuco Decl. ¶ 4; DeBernardi-Lieber Decl. 6; Jamar Depo. 148:9-11; Richmond Decl. ¶ 13; Hoang Decl. ¶ 5; Davis Decl. ¶ 4; Hartman Decl. ¶ 6; DeLeon Decl. ¶ 10; Carlson Decl. ¶ 11. Defendants also have `presented evidence that some employees choose to take meal periods at the scheduled times, while others take them later than those times. See, e.g., Hartman Decl. ¶ 6; Carlson Decl. ¶ 12; Longwith Decl. ¶ 9; Manna Decl. ¶ 12. Sunrise also has presented statistical evidence through its expert, Dr. Michael Ward, which shows a wide variation in meal breaks taken depending on job classifications, departments, and Sunrise locations. Ward Decl. ¶¶ 11, 45, Dkt. 91-6 . . . [T]he question whether and when team members missed or took late or shortened meal periods would require numerous individualized inquiries into the staffing at each Sunrise facility, how meal periods were scheduled, and why meal periods were missed.

*Id.* at 17-18.

The presence of these individualized defenses would make a class proceeding unmanageable. The application of the presumption of *Safeway* would not change this conclusion.

## V. <u>Conclusion</u>

For the reasons stated in this Order, the Motion is **DENIED.**

__________ : __________

Initials of Preparer ak